JM:WYC/LXN

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

ALAN BERKUN,

        Defendant.

- - - - - - - - - - - - - - - - -X

**M-10-102**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF ARREST
WARRANT

(18 U.S.C. § 1348)

EASTERN DISTRICT OF NEW YORK, SS:

    Kevin Riordan, being duly sworn, deposes and states that he is a Special Agent of the Federal Bureau of Investigation, duly appointed according to law and acting as such.

    Upon information and belief, in or about and between June 2008 and August 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ALAN BERKUN did knowingly and intentionally execute and attempt to execute a scheme and artifice to defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, specifically: the common stock of XenaCare Holdings, Inc.

    (Title 18, United States Code, Section 1348).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have served as a Special Agent with the Federal Bureau of Investigation for approximately 8 years, and am currently assigned to a squad that investigates fraud, including securities fraud. Over the course of my career, I have participated in numerous investigations into the fraudulent manipulation of stock prices, and ways in which individuals perpetuate fraud on the securities markets. During the course of these investigations, I have utilized a number of investigative techniques, including but not limited to interviewing witnesses, making consensually-recorded conversations, executing search warrants, reviewing financial records and trading data, and debriefing cooperating witnesses and confidential informants.

2. I make this affidavit based, in part, on general knowledge derived from my participation in this investigation and in part based upon my examination of records and conversations with other law enforcement agents. Where the contents of documents and conversations are included herein, they are reported in substance and in part, except where otherwise indicated.

---

[1]  Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause, I have not described all the relevant facts and circumstances of which I am aware.

3. In June 2008, the defendant ALAN BERKUN called a cooperating witness (the "CW") and proposed a stock manipulation scheme as set forth below.[2/] BERKUN and the CW previously had participated together in a stock manipulation scheme in approximately 2004.

4. By way of background, based on my training and experience and conversations with the CW, the securities fraud schemes conducted in 2004 and proposed by the defendant ALAN BERKUN in June 2008 had all of the characteristics of a market manipulation, or "pump-and-dump" scheme. In such a scheme, conspirators typically arrange to artificially inflate the price of a stock, after which they sell their stock or cause intermediaries to sell stock. The intermediaries, who are often corrupt brokers, are normally paid a kickback to induce them to sell their clients the stock while the price of the stock is being artificially inflated. It is generally understood among all of the conspirators that the brokers do not disclose to the kickbacks or, in some cases, their commissions, which are often excessive.

---

[2/] The CW has pled guilty to conspiracy to commit securities fraud and securities fraud, pursuant to a cooperation agreement.

4

5. On June 16, 2008, at the FBI's direction, the CW placed a consensually-recorded telephone call to the defendant ALAN BERKUN. An excerpt of their conversation follows:[3/]

BERKUN: . . . they'll make the stock like 95, a dollar, one. I probably could get myself a call on a hundred thousand shares. I'll squeeze 'em, I'll tell 'em, you know, I wanted to get it to, I'll see if I can squeeze 'em to like 50 cents, so there's a nice spread there. Right? There's almost, there's, you know, a half a buck in it.

CW: So I could give the brokers, you're saying . . .

BERKUN: We all can earn off of that. You lay out, you, you tell me how much you wanna give the brokers, how much you wanna make, and we'll keep the difference for putting the deal together.

CW: Okay. [UI] That was one of my questions. Cuz there was an ask [UI]

BERKUN: No, no. The other thing is they'll go up, they'll support the stock. They'll put, they'll put a market maker[4/] at, you know, at like 95 offered at 101, so there's no, you know, tight market. [voices overlapping]

CW: [UI] Even if you did 75 . . .

BERKUN: No, we'll make it 95, 101. It's okay. They want the action.

CW: I don't think you would get hit. That's, that was a . . . [UI]

---

[3/]  All of the excerpts of the consensually-recorded conversations contained herein are draft transcriptions.

[4/]  A "market maker" facilitates trading in a security by setting price quotations and holding itself out as prepared to buy and sell certain quantities of the security for its own account.

BERKUN: You, you, you won't. Listen, nobody's gonna get hit because there's no stock around.

CW: [UI] buy the stuff at a dollar, it closes at a half dollar, they look like an idiot.

BERKUN: No, no, no, but it won't. They're gonna go. If I could, if you could get this deal done, okay, alright? It'll be 95, 101. That's what we'll make the market, so it really looks like a strong market.

CW: Do you think they could buy a lot of stock, uh, around a dollar, though?

BERKUN: Yeah, I'll make sure of it.

\* \* \* \* \*

CW: Okay. And then how would they get paid?

BERKUN: Ah, you'll take care of that. You, you'll handle all the money side. Whatever you owe them, you'll take care of. I'll get it to ya. You know, no problem. If I gotta get on [U/I - voices overlapping] Listen, if I gotta get on a plane and fly up, I'll see ya. You know what I mean? Worst comes to worst.

CW: You could, you could send it like you did last time.

BERKUN: Yeah, right, right, right. We'll do the same shit. Don't worry about it.

CW: I had no problems getting it, and I'll bring it, I'll bring it to the brokers.

BERKUN: Yeah, absolutely.

CW: Okay. I'll do what I can. I have a few people interested, cause, none of them are makin' money retail-wise.

BERKUN: Right, right, right. This is a fuckin' score and they don't have to do a lot. Let me tell you something. The web site is beautiful, you know, they type in www.sunpill., you know, com and I'll

|  |  |
|---|---|
|  | get your product. You want me to send you up product as well? |
| CW: | It couldn't hurt, if . . . [voices overlapping] |
| BERKUN: | Yeah, right, and brochures and shit, yeah. You just let me know if it's a go because they'll get the certificate ready. You know, I'll, you know, and you know, whatever I gotta do. |
| CW: | Or, I could even offer them 25 cents in cash, right? |
| BERKUN: | Yeah. Yeah, that'll . . . |
| CW: | Then I could take . . . |
| BERKUN: | That leaves, that leaves 25 cents on the table and, you know, we'll whack that up. You know, listen, I don't mind. I'll go, I'll go . . . I'll split it down the middle with you. I'm a gentleman, I don't care. |
| CW: | I would even give them 20 cents and take 20 cents for me. [UI] |
| BERKUN: | That's fine, [redacted]. However you wanna earn. You know me, you know me, [redacted], you know, you know, as long as we do it, it's fine. |
| CW: | Okay. |
| BERKUN: | Alright? |
| CW: | You'll hear from me in the next couple days. |
| BERKUN: | Okay. Give me, you know, let me tell ya, I think the smart thing is, is you need some brochures from the company, some packages. I'll call them back. We'll call [redacted] and tell him we need that, get them to my office so I can ship 'em to you . . . |
| CW: | Okay. |
| BERKUN: | . . . so at least when the guy talks, he's got some information, okay? |

CW:      Absolutely. I mean . . .

BERKUN:  Filings are all public, they'll be nice, they can send their clients some sunpills, you know what I mean?

CW:      Yeah.

BERKUN:  And, uh, you know, and we'll take it from there.

CW:      Okay.

BERKUN:  I mean, you know, unless you want me to, you know, I think you see, if you say there's a lot of stock around, you'll make the guys nervous.

CW:      No, I understand, sure.

BERKUN:  But I could get, I could get a hundred thousand. Now, if they put it all away, and it works out well, we can get another hundred thousand. And maybe we'll do a little higher. You know what I mean, we'll take the stock up.

CW:      Okay.

BERKUN:  There's no, this stock is very tightly, and they're gonna do an acquisition. They got a, a paper manufacturer. The stock may go up on the NASDAQ. They got like a boxer that does their packaging. The guy's doing 10 million with a 3 million dollar bottom line, 4 million dollars in real estate. They wanna go on the NASDAQ.

CW:      And if I take it up a little bit, I can take a little bit more for myself.

BERKUN:  If you, right. If you decide, you say, "Hey Alan, listen, you did, we did 20,000 at a buck, now go a buck, a buck and a quarter." Not a problem, [redacted].

CW:      Alright.

BERKUN:  We'll make, we'll make, we'll all make more. I, I, I can get the stock at the 50-cent level, no problem.

CW:      Okay.  So how long would that take once I . . . ?

BERKUN:  Once you get started?  Within two, three days.

CW:      Okay.  Very good.

BERKUN:  And you know me.  We do the trades, you know, you tell me what was done, or I'll see it, and I'll settle up with you.

CW:      Okay.

BERKUN:  You know me.

            *   *   *   *   *

BERKUN:  . . . So, I'll open an account at Newbridge and I'll have the money in my account so you don't have to worry.  I don't have to chase anybody.  You follow me?

CW:      Yeah.  Very good.

BERKUN:  Or.  Yeah, cause the other way there's capital gains issues with these idiots.  I don't want to get them involved.  I know if I have the shares, [redacted], you know me long enough to know, we're good to go.

CW:      I'm not worried about you. [UI]

BERKUN:  Right.  Well, but I wanna have the shares.  I don't wanna have a situation where we're chasing somebody.

CW:      I don't want that either.

BERKUN:  No.  No problem.  Okay.  So you ask around and we'll see, okay?

CW:      Yeah, you'll hear from me in the next couple days.

BERKUN:  You got it buddy, thanks.  Alright?  See if you can get back to me by Thursday.  Alright, take care.

CW:      Definitely.

9

BERKUN:   Okay.  Bye-bye.

6.  The company that owns SunPill is XenaCare Holdings, Inc., a publicly traded company that is traded on the Over the Counter Bulletin Board (OTCBB),[5/] under the symbol "XCHO.OB."  Based on the company's last 10-K public filing with the Securities and Exchange Commission, XCHO shares are securities registered under Section 12 of the Securities Exchange Act of 1934.

7.  Based on my training and experience in securities fraud cases, during the above consensually-recorded telephone call, the defendant ALAN BERKUN related to the CW, in substance, that (a) BERKUN was able to obtain a large quantity of stock at 50 cents per share; (b) BERKUN and the CW could arrange to inflate the stock price by "support[ing] the stock" and making the market appear "strong," at a stock price of 95 cents to

---

[5/]   At all relevant times, the OCTBB was a quotation service that displayed real-time quotes, last sale prices and volume information in over-the-counter equity securities.  Based on my training and experience investigating securities fraud, I have learned that securities that are quoted on the OTCBB are generally smaller companies that are not listed or traded on any national securities exchange.  In addition, stocks traded on the OTCBB are often less liquid than stocks traded on a national securities exchange, meaning that the trading volume per day is generally lower.  Because of the low trading volume, if an unscrupulous market maker, broker or other market participant is able to gain control over a large block of an OCTBB stock, it is generally easier to manipulate the price of an OCTBB stock than one traded on the national exchange.

$1.01; and (c) the CW was to pay kickbacks and bribes to corrupt brokers for their participation in the scheme.

8. For example, when BERKUN stated "they'll go up, they'll support the stock. They'll put, they'll put a market maker at . . . like 95 offered at 101," BERKUN's meaning was that a coconspirator would be engaged to artificially inflate the price of the stock. Moreover, when BERKUN told the CW to tell him "how much you wanna give the brokers," BERKUN offered to pay secret kickbacks to corrupt brokers in exchange for their recommendation to their clients to buy the target stock.

9. Thereafter, on June 24, 2008, at the FBI's direction, the CW placed another consensually-recorded telephone call to the defendant ALAN BERKUN. During the call, the CW informed BERKUN, in substance, that he had identified a broker willing to participate the scheme, on the understanding that the broker was to receive 20 cents per share of the stock:

> BERKUN: Hello?
>
> CW: Hi Alan.
>
> BERKUN: Hey, [redacted]. How are you?
>
> CW: Um, I have somebody who is all set to do something.
>
> BERKUN: Okay.
>
> CW: Uh, he's gonna buy five tomorrow, and either five or ten the day after. He's gonna commit, originally, to 25,000 shares . . .
>
> BERKUN: Wow. Okay, well I gotta set . . .

| | |
|---|---|
| CW: | 25,000 dollars. |
| BERKUN: | Okay. |
| CW: | But if he gets paid quickly, he's gonna buy another . . . |
| BERKUN: | I got it. |
| CW: | At least another 75. |
| BERKUN: | Okay, fine. But here's the thing. I gotta set the, uh, the transaction up. So don't let him go to do it tomorrow, because I don't have the shares yet. |
| CW: | You tell me what he wants, when you want him . . . |
| BERKUN: | Okay, fine, alright. |
| CW: | Here's the thing. I told him I was gonna get him 20 cents a share. |
| BERKUN: | It's not a problem. |
| CW: | Wait a second, I'm not looking to, I just want to get him a taste, a couple thousand dollars on the first 10,000 shares . . . |
| BERKUN: | [Redacted], whatever you . . . |
| CW: | Don't even worry about me. I just . . . |
| BERKUN: | [Redacted], I got it. [UI] 'Cause once he tastes it, I got it, you don't have to explain it to me. |
| CW: | It'll be money for all of us, right. |
| BERKUN: | Yeah, I understand how it works. Okay. Lemme go get, get in touch with Gary and get the shares over to an account, okay? |
| CW: | Okay. |
| BERKUN: | And then I'll call you back. Just tell the guy it looks good, but don't do anything until you hear from me. |

CW:       I'll make sure he understands that, because he's not gonna get paid unless . . .

BERKUN:   When you tell him it could be ready by, uh, the end of the week or the beginning of next week, at the latest.

CW:       Okay, fine.

BERKUN:   Alright?

CW:       Very good.

BERKUN:   Let me get to work on it. Thanks, [redacted].

CW:       Okay.

BERKUN:   And we'll, listen, whatever the net is, you know I'll work it out with ya.

CW:       I know you will.

BERKUN:   I'll make sure everybody's happy. How long do you know me? You know, there's never been a problem.

CW:       I'm not concerned.

BERKUN:   Alright, great. Okay. Let's just take care of the broker . . .

CW:       [UI]

BERKUN:   . . . . because right, 'cause one broker could bring another broker, I know how it works.

CW:       That's gonna happen. Definitely.

BERKUN:   You got it buddy. Alright, lemme go, lemme go make the call. Good-bye.

CW:       Good luck.

BERKUN:   Good-bye, good-bye.

      10.   Thereafter, on August 14, 2008, at the FBI's direction, the CW placed another consensually-recorded telephone

call to the defendant ALAN BERKUN. During the call, the CW advised BERKUN, in substance, that the broker who had agreed to participate in the scheme had purchased 10,000 shares of stock at .56 cents per share. BERKUN then determined that he owed a kickback of $1,120 to the broker. BERKUN also observed, in substance, that they needed to take care of the brokers so that they would do more business in the future.

11. On August 16, 2008, the CW received a FedEx package from the defendant ALAN BERKUN, which was mailed from Boca Raton, Florida. Inside the FedEx envelope was a Sports Illustrated magazine, with a note affixed that read "[Redacted]: Look at page 47. Thanks." At page 47, an envelope was concealed within the magazine, which had notations on it indicating the arithmetic used to determine that $1,120 was the appropriate kickback for the purchase of 10,000 shares of stock at 56 cents per share. $1,120 in cash was contained within the envelope.

12. On August 19, 2008, at the FBI's direction, the CW placed another consensually-recorded telephone call to the defendant ALAN BERKUN. During the conversation, the CW advised BERKUN, in substance, that he was going to take the broker his "piece" of the kickback. In response, BERKUN requested, in substance, that the CW have his broker purchase another 10,000 shares of stock.

13. In connection with this investigation, the FBI

caused to be purchased 10,000 shares of XenaCare on August 14, 2008, through an account maintained and cleared within the Eastern District of New York.

14.  During 2008, the defendant ALAN BERKUN had pled guilty but was awaiting sentencing in three criminal cases pending in this District.  See Cr. No. 00-930(ILG)(charging, inter alia, securities fraud conspiracy); Cr. No. 00-1248 (NGG)(S-1)(charging, inter alia, securities fraud conspiracy); Cr. No. 01-1457 (ILG)(charging, inter alia, money laundering conspiracy).

15.  Based on the foregoing, there is probable cause to believe that in or about and between June 2008 and August 2008, the defendant ALAN BERKUN knowingly executed and attempted to execute a scheme to defraud persons in connection with securities of an issuer with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934.

\* \* \* \* \*

15

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant ALAN BERKUN may be dealt with according to law.

_____
Special Agent
Federal Bureau of Investigation

Sworn to before me this
1st day of February 2010

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK