# NABER PC

ATTORNEYS · COUNSELORS · RECHTSANWÄLTE

RECEIVED
12/9/11
Chambers of
I. Leo Glasser
U.S.D.J.

· **GREAT FALLS**
300 CENTRAL AVENUE SUITE 320
GREAT FALLS MONTANA 59401
TELEPHONE +1 406 452 3100
FACSIMILE +1 406 452 6599

· **BREMEN**
ROCKWINKELER LANDSTRASSE 55
28355 BREMEN
TELEPHONE +49 (0)421 258 5054
FACSIMILE +49 (0)421 258 5053

WWW.NABERPC.COM

DECEMBER 6 2011

Chambers of the Hon. Leo Glasser
US DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK
225 Cadman Plaza East
Brooklyn New York 11201

Lan Nguyen Esq.
US ATTORNEY's OFFICE
271 Cadman Plaza
Brooklyn New York 11201

Maryann Betts
US PROBATION & PRETRAIL
SERVICES
225 Cadman Plaza East
Brooklyn New York 11201-1818

Susan Wolfe Esq.
HOFFMAN & POLLOK
260 Madison Avenue
New York New York 10016

**14/09 In re EACC – U.S. v. Berkun, 00-cr-1248/00-cr-930/10-cr-512 & 11-cr-214, 01-cv-1457**
**Submission of Victim Impact Statement**

To Whom it May Concern:

Please find enclosed another Victim Impact Statement for consideration in the above-referenced matters concerning Mr. Berkun's criminal ploys and juggleries in Europe relating to the substance of the scam prosecuted in these matters.

They are believed to be more than 4,000 European victims of Mr. Berkun. His victims seek an Order of Criminal Restitution against Mr. Berkun as part of his sentence as their last resort. As stated in the Statements, all Victims offer to provide documentation translated into English concerning their individual losses, yet because of the costs associated with such translation will await the parties' request to do so before incurring further expenses in this matter.

Please advise of any additional documentation, information, or statements you wish to receive and review with respect to the facts, individual victims, and individual losses stated in the Victim Impact Statement, and I will gladly facilitate their production.

Respectfully,

Helge Naber
Rechtsanwalt
Attorney at Law
(z.Zt. Great Falls)

| 14/09.808 NA RAIDL |
| --- |
| VICTIM IMPACT STATEMENTS 00-CR-1248 (EDNY) |

1.     In late 1990, Defendant Arbel initiated the foundation of an Austrian company VTH GmbH with a principal place of business in Bregenz/Austria. VTH GmbH's sole business was the solicitation of equity investments in Europe American Captial Corporation (hereinafter "EACC"), an entity established under the laws of the British Virgin Islands on December 18, 1990, by private investors. Its initial capital was $10,000 reflected by 10,000 common stocks with a par value of $1 each. Defendant Arbel was EACC's president, and Defendant Berkun was EACC's corporate counsel. Purpose of EACC was in the investment in equity participation in European and American enterprises and the induction and financing of initial public offerings of the enterprises in which equity stakes were held. EACC authorized issuance of 20 million non-voting, guaranteed dividend preferred shares with a par value of $5 each to reflect third party equity investments of a total of $100,000,000.

Investors were offered two principal options of investments in EACC. The first were direct investments in EACC's preferred stock, with each share certificate reflecting a guaranteed rate of return (or dividend). It was represented to the victims that their equity investment in EACC was utilized to purchase US government bonds in order to secure the initial investment with a guaranteed rate of return of 16% per year. The second investment vehicle offered was the investment in so-called Units which described the investment in particularly composed stock portfolios EACC allegedly held in other enterprises. These enterprises were, *inter alia*, PlayCo Toys Inc., American Toys Inc., and Mr. Jay Fashion Inc. An agreement between VTH GmbH and EACC provided that the total assets of all issued preferred shares must be at any time $10 for 1 preferred share. Defendant Berkun periodically confirmed to VTH GmbH and the investors it solicited that

> "I am the duly appointed attorney for the foundation and confirm as follows: Upon verification of corporate bank account information, purchase order commission statements, share certificates and other documents required to be provided by law, I hereby confirm that the total assets represented by one preferred share of the foundation exceed a value of $10. I derive at this conclusion by dividing the total gross assets by the number of preferred shares issued."

In its prospectus, EACC further presented that dividend payments are to be assessed and distributed quarterly. It also represented that EACC acquired U.S. government bonds and blue chip-stocks to secure investors' initial equity investment in EACC. Between 1990 and 1999, EACC indirectly solicited equity investments from 4,428 private investors and received between $55,835,785 and $79,120,205 from those investors. Initially, Defendant Arbel picked up the invested funds in Austria himself, later funds were electronically transferred directly to an account of EACC. VTH GmbH and the private investors received statements from EACC which showed substantial share portfolios as well as (beneficial) ownership of U.S. government bonds. This way, each investor was regularly informed that his contribution was not only invested in shares of other entities, but also backed by U.S. government certificates.

In 1996, EACC informed its private investors, through VTH GmbH that Defendan Arbel as president of EACC was encountering problems with U.S. tax authorities. To escape seizure of EACC's funds and assets by U.S. tax and customs authorities, and thus preservation of dividend to be guaranteed paid to private investors, EACC announce it to be necessary to transfer EACC's entire assets into an offshore foundation. Subsequent to such announcement, Defendant Arbel incorporated the European American Capital Foundation (hereinafter "EACF") in Liechtenstein on September 3, 1996. Concerning the assets and equity equipment of EACF, (beneficial) ownership of U.S. government bonds as well as share portfolios was transferred to it.

It was represented that the foundation's assets had to match twice the amount of the combined par value of all preferred shared issued. Defendant Arbel further announced that EACF's assets were transferred to other affiliated entities for tax purposes, namely an "ABC Fund" and a 'Europe American

Capital Fund" (hereinafter "EAC Fund"). Defendant Berkun continued to valuate and certify quarterly the assets, holdings and portfolios of EACF, and generated confirmation stating that EACF's assets met or exceeded twice the value the par value of each per preferred share issued.

Both the ABC Fund and the EAC Fund allegedly owned by EACF were managed and controlled by Defendants Arbel and Berkun. Their respective assets were allegedly available as collateral for the nominal contributions of each private investor. EACF was administered by an entity called *Fiduciaria-Treuhand* in Liechtenstein. During the term of their respective investments, private investors were continuously informed about the successful performance and development of their investments. For example, on September 30, 1994, private investors were advised that the portfolios were worth $2.9 million more than the promised double par value of the preferred stocks they had acquired, that blue chip investment portfolios developed about market average, and that the direct equity holding in Mr. Jay Fashion Inc. and American Toys Inc. showed great potential in consideration of their continuously increasing stock prices. Concurrently, private investors were offered the opportunity to acquire stock of those entities direcly in a 'preferential offering'.

In January 2000, VTH GmbH requested that EACF transferred its assets to bank accounts maintained in Valduz/Liechtenstein and that a bank valuate its holdings, portfolios, and other assets. Even though Defendant Arbel consented to this undertaking, it was never followed through. In September 2000, Defendant Arbel transferred all of EACF equity capital, and thus the private investment funds contributed by the victim, *inter alia*, to a company Fiduciaria Biaccini in Lugano/Switzerland. A representative of Fiduciaria Biaccini confirmed the transfer and that Fiduciaria Biaccini was holding such assets 'to the benefit' of the preferred shareholders of EACC. Private investors, through VTH GmbH, requested rescission of this transfer, but Defendant Arbel disappeared shortly thereafter, and VTH GmbH declared bankruptcy. Only a small amount of the account balances could be seized in Lugano by the bankruptcy trustee, and was barely sufficient to cover administrative expenses incurred by the trustee. Np hard proof was ever detected that the private investment contributions were invested in anything of value, or at all.

PriceWaterhouseCooper conducted a financial audit of the assets held by Fiduciaria as of Decemeber 31, 1999, and stated the following assets:

| | |
|---|---|
| U.S. government bond | $ 0.00 |
| Common stock holdings | $ 0.00 |
| Preferred stock holdings | $ 0.00 |
| Convertible bonds holdings | $ 0.00 |
| cash | $ 2,533,445 |

No U.S. government bonds to secure the equity contributions of the private investors were ever acquired. No direct equity participation in active, operating companies was ever acquired. PlayCo Toys Inc., American Toys Inc. and Mr. Jay Fashion Inc. were dummy corporation established by Defendant Arbel which never had an active business. Defendant Arbel was chairman of PlayCo Inc. from 1994 to 1997, and president of MultiMedia Concepts International which was part of EACC's portrayed portfolio. Other active officers of MultiMedia Concepts International included Defendant Arbel's wife and brother. Defendant Arbel was also president of European Ventures Corp. Defendant Arbel had sole signatory and dispositive authority over EEAC's accounts. The enterprises in which EEAC misrepresented to have equity interests in were controlled by Defendant Arbel through related persons, e.g. Harold Rashbaum, Defendant Arbel's father in law, was president of Toys International Corp.

Defendant Arbel represented toward PriceWaterhouseCooper that stocks of these entities were acquired and invested in to the benefit of EECF and in its name. PriceWaterhouseCooper attested that $140 million worth of stock were transferred from the EACF foundation to Fiduciaria Biaccini/Switzerland. None of the stocks could be found, traced, or recovered.

The audit report of PriceWaterhouseCooper attests that an entity called American Telecom Inc. acted as intermediate holding company for various EACC/EACF investment, including but not limited to

PlayCo Toys Inc. Defendant Berkun was president and/or chief executive officer of American Telecom Inc., which indicates that Defendant Berkun was involved beyond a participation of merely aiding and abetting Defendant Arbel's actions. Defendant Berkun also acted as trustee of the ABC Fund which held stocks or other funds for the benefit of EACC/EACF investors.

The funds Defendants Arbel and Berkun received from investors were not invested, but channeled such funds through a variety of sham entities in various locations back to the U.S., where all defendants involved in the domestic scheme then benefited from such ill-gotten "investment" funds.

2. There are approximately 4,000 European investors who were lured into investing funds through VHT GmbH in EACC and related entities by Defendant Berkun's and Defendant Arbel's misrepresentations and promises:

Victim Bernd Raidl, Fitzenweiler Strasse 9a in 88677 Markdorf/Germany, is the beneficial owner of the restitution claim of Siegfried Schaefer, Silvrettablick 5 in 88682 Salem/Germany of EUR 53,028.00 (x 0.9281 as of March 8, 2001 = USD 49,215.29). Victim Raidl was originally sued by Mr. Schaefer for recommending an engagement in EACC/VTH; subsequently a settlement was reached and Victim Raidl is now the beneficial owner of any and all claims stemming from the original investment with EACC. The Court's order confirming the settlement in OLG Karlsruhe dated November 4, 2002, Cause No. 9 U 195/02, is included herewith.

3. None of the afore-mentioned judgments have been satisfied. Most notably, Defendant Berkun was represented by local counsel in Germany in some, but not all of the law suits, with some being resolved by judgment and others being resolved by court-approved settlements. He was, however, properly served with process in all of them. Defendant Berkun has thus far escaped his responsibility for the EACC scam he orchestrated in various European countries, and his assets had been frozen at the inception of this proceeding. Hence, Defendant Berkun's victims, as far as they obtained judgments to recover their losses, have been unable to execute upon their respective judgments because assets he may have had at the inception of the German litigation had since been seized, held, and possibly liquidated by the prosecuting U.S. Attorney's office.

An order of criminal restitution is sought to ensure Defendant Berkun no longer evades his responsibilities and to secure repayment from assets and funds, if any, generally available for criminal restitution in this matter. The Victims offer to provide translations of the German judgments upon request, as the costs for such translations is significant. The Victims also offer to more concisely compute the total amount now owing under said judgments, so that an accurate amount including accrued interest can be considered by the Court.

• • •

*- Ausfertigung -*

| | | |
|---|---|---|
| **Geschäftsnummer:**<br>9 U 195/02<br>4 O 434/01<br>Landgericht<br>Konstanz |  | **Verkündet am**<br>30. Oktober 2003<br><br>Schnaider, JAng.e<br>als Urkundsbeamtin<br>der Geschäftsstelle |

# Oberlandesgericht Karlsruhe
## 9. Zivilsenat
## Im Namen des Volkes
## Urteil

Schrade & Partner
Singen
Eingegangen am
**24. NOV. 2003**

In dem Rechtsstreit

**Siegfried Schäfer**
Silvrettablick 5, 88682 Salem

- Kläger / Berufungsbeklagter -

Prozessbevollmächtigte:
Rechtsanwälte Behler u. Koll., Brückenkopfstr. 1/2, 69120 Heidelberg  (BB-03/00015)

**gegen**

**Bernd Arnold Raidl**
Fitzenweiler Str. 9 a, 88677 Markdorf

- Beklagter / Berufungskläger -

Prozessbevollmächtigte:
Rechtsanwälte Schrade u. Koll., Julius-Bührer-Str. 4, 78224 Singen  (20416-02)

**wegen** Schadensersatzes

hat der 9. Zivilsenat des Oberlandesgerichts Karlsruhe auf die mündliche Verhandlung vom 16. Oktober 2003 unter Mitwirkung von

Richter am Oberlandesgericht Müller-Bütow
Richterin am Oberlandesgericht Hailbronner-Gabel
Richterin am Amtsgericht Dr. Geers

für  **Recht**  erkannt:

*URTEIL RAIDL FÜR HERRN Franck !*

**Begründung:**

I.

Der Kläger, selbständiger Klavierlehrer, beansprucht von dem Beklagten, der als Verkäufer im Einzelhandel tätig war und mit dem er vor Entstehung der Streitigkeiten etwa 10 Jahre befreundet war, aus eigenem und abgetretenem Recht Schadensersatz wegen fehlgeschlagener Kapitalanlagen, teilweise gestützt auf eine nach Entstehung des Schadens getroffene schriftliche Vereinbarung der Parteien vom 27.11.2000.

Der Kläger hat geltend gemacht, der Beklagte habe schuldhaft seine Auskunfts- und Beratungspflichten verletzt und hafte im übrigen selbst dann, wenn er nur als Vertreter des Platzierungsmaklers der Anlage aufgetreten wäre, da er wegen seiner vorgegebenen Sachkunde besonderes Vertrauen des Klägers in Anspruch genommen und aus wirtschaftlichem Eigeninteresse gehandelt habe.

Der Kläger hat beantragt,

1. den Beklagten zu verurteilen, an ihn 79.541,17 € zuzüglich 5 % Zinsen über dem jeweiligen Basiszinssatz ab 15.11.2001 zu zahlen Zug um Zug gegen Abtretung sämtlicher Ansprüche aus den Beteiligungen;
2. den Beklagten zu verurteilen, an den Kläger 6.135,50 € nebst 5 % Zinsen über dem jeweiligen Basiszinssatz ab 02.08.2002 zu zahlen;
3. den Beklagten zu verurteilen, an den Kläger 511,30 € monatlich, beginnend ab dem 31.08.2002 jeweils zum Ende eines Monats zu zahlen.

Der Beklagte hat beantragt,

die Klage abzuweisen.

Er hat jegliche Einstandspflicht bestritten und geltend gemacht, lediglich Vertreter der Vermögenstreuhand GmbH in Bregenz (künftig : VTH) gewesen zu sein. Auch bei Annahme einer Stellung als Anlagevermittler habe er keine ihn insoweit treffenden Pflichten verletzt, da er nur seine Einschätzung wiedergegeben habe, dass die in Aussicht

genommene Anlage sicher sei, er aber dem Kläger neben der Verweisung an die VTH in Bregenz wegen weiterer Auskünfte und Informationen hinreichend deutlich gemacht habe, dass er selbst keine Prüfung vorgenommen habe und vornehmen könne und über keine besonderen Informationen und keine besondere Sachkunde verfüge.

Das Landgericht hat der Klage teilweise stattgegeben. Es hat vertragliche Ansprüche aus der Vereinbarung vom 27.11.2000 verneint und auf der Grundlage eines Mitverschuldens des Klägers von 1/3 eine Haftung des Beklagten wegen Verletzung seiner Auskunftspflichten als Anlagevermittler bejaht.

Gegen dieses Urteil wenden sich beide Parteien mit ihrer Berufung.

Der Beklagte macht unter Ergänzung seines Vorbringens erster Instanz geltend, der Beklagte habe aufgrund seines mit der VTH geschlossenen Vertrages und der ihm von dieser erteilten Vollmacht als deren Bevollmächtigter gehandelt, so dass nur eine Haftung dieser Gesellschaft und keine eigene Haftung in Betracht komme. Die von der Rechtsprechung aufgestellten besonderen Erfordernisse zur Eigenhaftung des bevollmächtigten Vertreters lägen nicht vor. Sofern er jedoch selbständiger Anlagenvermittler gewesen sei, scheitere seine Haftung an dem Fehlen schuldhafter Pflichtverletzungen. Er habe alle Informationsquellen offengelegt und klargestellt, dass er nur über unzureichende Kenntnisse verfüge und keine weiteren Informationen geben könne. Deshalb habe er den Kläger an die VTH in Bregenz zur weiteren Erkundigung verwiesen.

Der Beklagte beantragt,

> auf seine Berufung das Urteil des Landgerichts Konstanz vom 14.11.2002 abzuändern und die Klage abzuweisen.

Der Kläger hat seine Anschlussberufung zurückgenommen und beantragt,

> die Berufung des Beklagten zurückzuweisen.

Er ergänzt sein Vorbringen erster Instanz.

Der Senat hat Beweis erhoben durch Vernehmung der Zeugen Gisela Schäfer, Marianne Veeser, Andreas Jäger, Robert Heske und Martina Haller sowie mit Einverständnis der Parteien durch Verwertung einer schriftlichen Zeugenerklärung von Dr. Andreas Altmann. Hinsichtlich des Ergebnisses wird auf die gerichtliche Niederschrift vom 16.10.2003 Bezug genommen.

II.

Die Berufung des Beklagten ist nicht begründet. Er ist dem Kläger in dem vom Landgericht zuerkannten Umfang zum Schadensersatz verpflichtet. Er hat Pflichten des im Rahmen der Anlagevermittlung zwischen dem Kläger als Anlageinteressent und ihm als Anlagevermittler zustande gekommenen Auskunftsvertrages mit Haftungsfolgen verletzt. Zur Höhe des vom Kläger zu beanspruchenden Schadens wird auf die tatsächlichen Feststellungen in dem Urteil des Landgerichts Bezug genommen, gegen die die Berufung nichts erhebliches vorbringt.

1. Der Beklagte wurde für den Kläger nicht nur im Rahmen eines reinen Gefälligkeitsverhältnisses ohne rechtliche Verpflichtung tätig. Dagegen spricht bereits Umfang und Tragweite der Anlagen des Klägers, die dieser aufgrund „Empfehlungen" des Beklagten getätigt hat und der Umstand, dass der Beklagte für die Vermittlung eine Provision zwischen 5% und 6 % erhalten hat.

Der Beklagte war nicht Anlageberater des Klägers sondern Anlagevermittler. Ein Anlageberater wird im allgemeinen dann in Anspruch genommen, wenn der Kapitalanleger selbst keine ausreichenden wirtschaftlichen Kenntnisse und keinen genügenden Überblick über wirtschaftliche Zusammenhänge hat. Er erwartet dann nicht nur die Mitteilung von Tatsachen, sondern insbesondere deren fachkundige Bewertung und Beurteilung, häufig auch eine auf seine persönlichen Verhältnisse zugeschnittene Beratung, die er besonders honoriert. In einem solchen Vertragsverhältnis hat der Berater regelmäßig weitergehende Pflichten gegenüber dem beratenden Kapitalanleger. Als unabhängiger individueller Berater, dem weitreichend das persönliche Vertrauen entgegengebracht wird, muss er besonders differenziert und fundiert beraten (BGH NJW RR 1993, 1114 m.w.N.). Diese Voraussetzungen liegen schon deshalb nicht vor, weil der Beklagte für den Kläger erkennbar keine allgemein

beratende Tätigkeit entfaltet hat und sich seine Tätigkeit auf die Vermittlung einer speziellen Kapitalanlage beschränkte. Einzelheiten zu weiteren Anlagen des Klägers sind nicht vorgetragen.

Im Rahmen einer solchen Anlagevermittlung kommt zwischen dem Anlageinteressenten und dem Anlagevermittler ein Auskunftsvertrag mit Haftungsfolgen zumindest stillschweigend zustande, wenn der Interessent deutlich macht, dass er auf eine bestimmte Anlageentscheidung bezogen die besonderen Kenntnisse und Verbindungen des Vermittlers in Anspruch nehmen will und der Anlagevermittler die gewünschte Tätigkeit beginnt (BGH NJW 2002, 2641; NJW RR 2000, 998; NJW RR 1993, 1114, jew.m.w.N.). Nach dem Umfang der Anlagen, den intensiven Gesprächen der Parteien, wenn auch unter Freunden, und angesichts der besonderen Vorkenntnisse des Beklagten, die den Gesprächen zugrunde lagen, ist auch unter Berücksichtigung der sich aus dem Erhalt einer Provision von der VTH ergebenden Interessenlage des Beklagten von einem zumindest stillschweigend zwischen den Parteien geschlossenen Auskunftsvertrag auszugehen.

Ohne Erfolg macht der Beklagte geltend, ein solcher Auskunftsvertrag sei nicht mit ihm persönlich sondern mit der VTH in Bregenz zustande gekommen. Zwar ist es richtig, dass von dem Beklagten mit der VTH am 09.12.1998 ein Vermittlungsvertrag geschlossen wurde, der den Beklagten verpflichtete, als Vermittler für diese tätig zu werden. Dennoch ist der entsprechende Auskunftsvertrag mit Haftungsfolgen hier nicht zwischen dem Kläger und der VTH, sondern zwischen den Parteien zustande gekommen. Entscheidend für das Zustandekommen eines solchen unmittelbaren Vertragsverhältnisses ist das uneingeschränkte Auftreten des Beklagten als Anlagevermittler. Der Beklagte hat nichts erhebliches dafür vorgetragen, dass er dem Kläger gegenüber erkennbar nicht im eigenen Namen sondern als Vertreter der VTH aufgetreten ist. Ohne Offenlegung einer solchen Vertreterstellung musste der Kläger daher davon ausgehen, dass der Beklagte persönlich sein Vertragspartner ist. In der vom Beklagten vermittelten „EACC-Sondervereinbarung" vom 26.03.1999, zu deren Abschluss die Parteien gemeinsam nach Bregenz fuhren, ist keine Rede davon, dass der Beklagte für die VTH als deren Bevollmächtigter tätig wurde. So der Beklagte nicht im eigenen Namen auftreten wollte, hätte er dies dem Kläger gegenüber deutlich machen müssen. In späteren Zeichnungsvereinbarungen vom 25.09.

und 15.10.2000 ist der Beklagte ausdrücklich als „Vermittler/Berater" bezeichnet, so dass es insgesamt für eine Stellung des Beklagten nur als Vertreter eines Dritten für den Kläger keinen Anhaltspunkt gab.

Im Rahmen eines solchen Vertragsverhältnisses ist der Vermittler selbst dem Vertragspartner zur Auskunft verpflichtet. Dieser Auskunftsvertrag verpflichtet den Vermittler zur richtigen und vollständigen Information über diejenigen tatsächlichen Umstände, die für den Anlageentschluss des Interessenten von besonderer Bedeutung sind. Dazu bedarf es - jedenfalls grundsätzlich - vorab der eigenen Information des Anlagevermittlers hinsichtlich der Wirtschaftlichkeit der Anlage und der Bonität des Kapitalsuchenden. Ohne zutreffende Angaben über die hierfür maßgebenden Umstände kann der Anlageinteressent sein Engagement nicht zuverlässig beurteilen und keine sachgerechte Anlageentscheidung treffen. Liegen dazu objektive Daten nicht vor oder verfügt der Anlagevermittler mangels Einholung entsprechender Informationen insoweit nur über unzureichende Kenntnisse, so muss er dies dem anderen Teil zumindest offen legen (BGH NJW 2002, 2641, NJW RR 2000, 998, NJW RR 1993, 1115). Wer sich als Anlagevermittler betätigt, hat über die dafür nötigen und zu erwartenden Kenntnisse zu verfügen oder offen zu legen, dass dies nicht der Fall ist.

2. Der Beklagte hat sich bereits nicht ausreichend über die Wirtschaftlichkeit und Bonität der Kapitalsuchenden informiert. Er hat sich im wesentlichen darauf verlassen, dass andere über Jahre die zugesagte Rendite ausgezahlt bekommen haben und in einem Fall das Kapital zurückgezahlt wurde. Im übrigen hat er sich mit Angaben und Zusagen der für die VTH in Bregenz Handelnden verlassen. Bereits bei der gebotenen Prüfung des Prospektes hätte ihm auffallen müssen, dass es sich um eine völlig ungesicherte Anlage handelte. Dies ergibt sich bereits daraus, dass über einen eingeschalteten Platzierungsmakler in Österreich das Geld an eine Geschäftsfirma auf den britischen Virgin Islands fließt und schon deshalb die Mittelverwendung und Sicherheit der Anlage für einen Anleger in Deutschland weder zu prüfen noch zu überwachen ist. Ihm hätte auch auffallen müssen, dass die behauptete Sicherheit sowohl im Text des Prospektes als auch in der Darstellung „bevorzugte Beteiligung" und „nachgelagerte Beteiligungs-Chance" nichtssagend ist. Es ist ein Widerspruch in

sich, dass das angelegte Geld in Wertpapieren investiert wird, die „die Summe an ausgegebenen, ausstehenden Vorzugsaktien wertmäßig um 100 % übersteigt". Auch die Angabe, dass die Vermögenswerte als sogenanntes Sondervermögen verwaltet werden, lässt keinen Schluss auf eine Sicherheit der Anlage zu. Auch aus dem Hinweis auf ein Stiftungsvermögen ergibt sich keine Sicherheit der Anlage. Schon dies hätte den Beklagten stutzig machen müssen Bei der von ihm geschuldeten sorgfältigen Prüfung des Prospektes hätte ihm auffallen müssen, dass es sich bei der von ihm empfohlenen Anlage um eine Anlage ohne jede Sicherheit für den Anleger handelte. Der Anleger muss vielmehr blind darauf vertrauen, dass er nicht von einem derjenigen, an die im weiteren Verlauf investierte Gelder gelangen, um sein Geld betrogen wird. Nach eigenem Bekunden hatte der Beklagte keine weiteren verlässlichen Informationen, aus denen sich die Sicherheit der Anlage ergab.

Bereits daraus, dass allein der Beklagte über die unmittelbaren Kontakte verfügte und den Beklagten zur VTH nach Bregenz begleitete ergibt sich, dass der Kläger für seine Anlageentscheidung die besonderen Kenntnisse und Verbindungen des Beklagten in Anspruch nehmen wollte.

Der Beklagte hat seine sich aus dem Anlagevermittlungsvertrag ergebende Auskunftspflicht dadurch verletzt, dass er den Kläger nicht darauf hingewiesen hat, dass er selbst über keine sicheren Erkenntnisse hinsichtlich der Sicherheit und Plausibilität der Anlage verfügte. Durch die Beweisaufnahme ist die Behauptung des Beklagten widerlegt, er habe sich selbst in Bezug auf die Anlage als völlig unwissend dargestellt und den Kläger wegen Informationen über die Anlage stets an die VTH in Bregenz verwiesen. Die Zeugin Gisela Schäfer, die Ehefrau des Klägers hat überzeugend geschildert, wie es auf Betreiben des Beklagten zu den jeweiligen Kapitalanlagen im wesentlichen sogar unter Beleihung ihres Grundstücks gekommen ist. Der Beklagte hat danach versichert, er habe alles überprüft und stets von einer Kapitalgarantie, einer 200 %igen Sicherheit über Liechtenstein und einer Verdoppelung in fünf Jahren gesprochen. Zwar ist bei der Beurteilung der Glaubwürdigkeit dieser Zeugin zu berücksichtigen, dass sie die Ehefrau des Klägers ist und ihren Teil ihrer Ansprüche an den Kläger abgetreten hat. Abgesehen von der Glaubwürdigkeit der in sich stimmigen Schilderung der Zeugin wird ihre Glaubwürdigkeit und die Richtigkeit ihrer Aussage durch die übereinstimmenden ihrerseits glaubwürdigen Aussagen

der weitgehend unbeteiligten und mit beiden Parteien befreundeten oder befreundet gewesenen Zeugen Marianne Veeser, Siegfried Binder, Andreas Jäger und Robert Heske bestätigt. Auch den Zeugen Marianne Veeser und Siegfried Binder gegenüber wurde seitens des Beklagten von einer ganz sicheren und 200 %ig über Liechtenstein abgesicherten Anlage gesprochen. Gleiches hat der Zeuge Andreas Jäger ausgesagt, der darüber hinaus die Äußerungen des Beklagten in Erinnerung hatte, es gebe kein Risiko, er habe die Anlage eingehend geprüft und könne sie guten Gewissens empfehlen. Auch nach der Aussage des Zeugen Robert Heske hat der Beklagte von einer doppelten Sicherheit über Liechtenstein mit gleichem Kapital und darüber gesprochen, dass er den Prospekt selbst geprüft habe. Nach diesen überzeugenden übereinstimmenden Aussagen kann keine Rede davon sein, dass der Beklagte den jeweiligen Kapitalinteressenten nur erklärt hat, er selbst habe über die Anlage keine Ahnung, die Anleger müssten sich bei der VTH in Bregenz selbst informieren. Auch nach der schriftlichen Aussage des Zeugen Dr. Altmann hat der Beklagte, von der Anlage begeistert, diese und sein Kreditkonzept vorgestellt. Aus dem vom Zeugen wiedergegeben Vorschlag des Klägers, nach Bregenz zu fahren und sich dort näher zu informieren, folgt nicht, dass der Kläger sich als unwissend darstellte.

Zwar hat sich die Lebensgefährtin des Beklagten als Zeugin an solche Erklärungen des Beklagten über die Sicherheit der Anlage nicht erinnert. Ihre wenig detailreiche Aussage beschränkte sich in diesem Punkt im wesentlichen darauf, der Beklagte habe ohne entsprechende Vorbildung schon keine Erklärungen über die Anlage abgeben können und deshalb die Interessenten stets bezüglich Informationen an Herrn Raschbauer von der VTH in Bregenz verwiesen. Das erste Beratungsgespräch über die Anlage, meinte sie, habe bei der VTH in Bregenz stattgefunden. Auf Vorhalt, weshalb der Kläger ohne vorherige Beratung 20.000,00 DM bereits mit nach Bregenz genommen habe, meinte sie, wohl zur Rechtfertigung der Schlüssigkeit ihrer Aussage, das Geld sei erst später überwiesen worden, was unstreitig nicht zutrifft. Ihre Aussage vermittelte insgesamt den Eindruck, dass die Zeugin bewusst oder unbewusst den Anschein vermitteln wollte, ihr Lebensgefährte habe keinem der Interessenten aus dem Freundeskreis zum Tätigen der Anlage mit Argumenten zugeredet und inhaltlich insbesondere auch zur Sicherheit der Anlage nichts gesagt, was nach den gesamten unstreitigen Umständen ohnehin lebensfremd wäre. Nach

den gesamten Umständen und unter Berücksichtigung des im wesentlichen übereinstimmenden dieser Aussage widersprechenden Inhalts der Aussagen der übrigen, insbesondere der unbeteiligten und mit dem Beklagten nicht in Streit lebenden Zeugen, hält der Senat die Aussage dieser Zeugin für nicht glaubwürdig.

3. Somit hat der Beklagte als Anlagevermittler seine Pflicht dadurch verletzt, dass er über die Anlage leichtfertig nicht geprüfte und unrichtige Angaben gemacht und nicht klargestellt hat, dass er selbst über die Anlage keine gesicherten Kenntnisse hat.

Nach den gesamten Umständen hat der Senat auch keinen Zweifel, dass der Kläger die vom Beklagten vermittelten Anlagen nur deshalb getätigt hat, weil er den Auskünften des Beklagten über die Anlage insbesondere deren Sicherheit vertraute. Somit ist von einer Ursächlichkeit der Pflichtverletzung des Beklagten für den Schaden auszugehen.

Ohne Erfolg macht der Beklagte geltend, für den entstandenen Schaden sei das Verhalten des Beklagten schon deshalb nicht ursächlich, weil Rechtsanwalt Dr. Henkel bereits Anfang des Jahres 2000 zunächst im Freundeskreis und später bei einem gemeinsamen Besuch bei der VTH in Bregenz Zweifel an der Seriosität der EACC-Anlagen geäußert und seinerzeit unter Hinweis auf Ungereimtheiten der Angebote eine eigene Zeichnung abgelehnt hat. Zu diesem Zeitpunkt war die Anlage bereits getätigt. Die Ursächlichkeit der Vertragsverletzung der Beklagten, die zu dieser fehlgeschlagenen Anlage führte, währte fort. Soweit der Kläger diesem Hinweis nicht Rechnung trug, ist dem bereits beim Ansatz eines erheblichen Mitverschuldens Rechnung getragen. Hinzu kommt, dass der Beklagte, der selbst solche Anlagen getätigt hatte, diesen Hinweis weder selbst zum Anlass genommen hat, seine Anlagen zu kündigen noch dazu, auf den Kläger einzuwirken, sich sofort von seiner Anlage zu trennen. Auch eine andere Haftungsverteilung ist deshalb nicht gerechtfertigt.

4. Der Senat hält die vom Landgericht vorgenommene Anrechnung eines Mitverschuldens des Klägers an der Schadensentstehung gemäß § 254 BGB ebenso wie die angenommene Quote von 1/3 für zutreffend. Insoweit wird auf das Urteil des Land-

gerichts Bezug genommen. Das Vorbringen der Berufung rechtfertigt keine höhere Mithaftungsquote des Klägers.

Die Kostenentscheidung beruht auf § 92 Abs. 1 ZPO, die übrigen Nebenentscheidungen auf §§ 708 Nr. 10, 711 ZPO. Die Voraussetzungen der Zulassung der Revision gemäß § 543 Abs. 2 ZPO liegen nicht vor.

| Müller-Bütow | Hailbronner-Gabel | Dr. Geers |
|---|---|---|
| Richter am OLG | Richterin am OLG | Richterin am AG |

Ausgefertigt:
Die Urkundsbeamtin
der Geschäftsstelle

Schnaider
Justizangestellte

