1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - -    X

4    UNITED STATES OF AMERICA,   :   CR 00-930   00-1248   01-1457
                                     10 CR 512   11-214
5                                :

6
        -against-               :
7                                   United States Courthouse
                                    Brooklyn, New York
8    ALAN BERKUN,                :

9                                   January 5, 2012
            Defendant.          :   10:30 o'clock a.m.
10
     - - - - - - - - - - - -    X
11

12               TRANSCRIPT OF SENTENCING
             BEFORE THE HONORABLE I. LEO GLASSER
13           UNITED STATES SENIOR JUDGE

14   APPEARANCES:

15   For the Government:        LORETTA E. LYNCH
                                United States Attorney
16                              BY: LAN NGUYEN
                                    KATHERINE NANDAN
17                                  MATTHEW MUELLER
                                Assistant United States Attorneys
18                              271 Cadman Plaza East
                                Brooklyn, New York
19

20   For the Defendant:         JEFFREY HOFFMAN, ESQ.
                                SUSAN WOLFE, ESQ.
21

22   Court Reporter:            Gene Rudolph
                                225 Cadman Plaza East
23                              Brooklyn, New York
                                (718) 613-2538
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

GR      OCR     CM     CRR     CSR

2

1           THE COURT:  Mr. Hoffman, this was emailed to me

2    yesterday at my request.  I don't know that you have had an

3    opportunity to see it.

4           That email that you sent to me, was a copy made

5    available to defense counsel, Mr. Marcigliano?

6           PROBATION OFFICER:  Did defense counsel get a copy

7    of the email I sent to the judge?

8           MS. WOLFE:  No.

9           PROBATION OFFICER:  No.  I think that was directly

10   to Your Honor.

11          THE COURT:  I made two copies.  The Assistant will

12   share it with you.  If you want to take a couple of minutes to

13   look at it.

14          PROBATION OFFICER:  Officer Betts broke her ankle.

15   She is available by phone.  She is unavailable for court.

16          MR. HOFFMAN:  May we have just one second to peruse

17   this quickly?

18          THE COURT:  Yes.  Sit down.  You will be more

19   comfortable.

20          MR. HOFFMAN:  Thank you.

21          (Pause.)

22          THE COURT:  Call the case, please.

23          THE CLERK:  This is criminal cause for sentencing in

24   docket number 00-930, 00-1248, 01-1457, 10 CR 512 and

25   11 CR 214, United States versus Alan Berkun.

3

1          Counsel and Probation, please state your names for

2     the record.

3          MS. NGUYEN:  Good morning, Your Honor.

4          Lan Nguyen for the United States.

5          With me are Katherine Nandan from our office and

6     Matthew Mueller from DOJ Tax.

7          PROBATION OFFICER:  Good morning, Your Honor.

8          Frank Marcigliano from the United States Probation

9     Department.

10          THE COURT:  Good morning.

11          MR. HOFFMAN:  Good morning, Your Honor.

12          Jeffrey Hoffman and Susan Wolfe for the defendant.

13          MS. WOLFE:  Good morning.

14          THE COURT:  Are you ready to proceed, Mr. Hoffman?

15          MR. HOFFMAN:  We are, Your Honor.

16          THE COURT:  I know you have reviewed the presentence

17     report with the defendant.  You have reviewed the presentence

18     report?

19          MR. HOFFMAN:  Yes, I have.

20          THE COURT:  You have taken a series of objections to

21     them.  Why don't we deal with those now?

22          MR. HOFFMAN:  I'm sorry?

23          THE COURT:  I said, you have taken a series of

24     objections.

25          MR. HOFFMAN:  That is correct.

4

1          THE COURT:  And exceptions.

2          MR. HOFFMAN:  That is correct.

3          THE COURT:  To the presentence reports.  Why don't

4    we deal with those now.

5          For the record, you have received a copy of an email

6    that I got yesterday?

7          MR. HOFFMAN:  Correct.

8          THE COURT:  That indicates what the Probation's view

9    of the guideline advisory determination ought to be.

10         MR. HOFFMAN:  Correct, Your Honor.

11         THE COURT:  I will hear you.

12         MR. HOFFMAN:  I am going to let Ms. Wolfe, if I may,

13   address those.

14         THE COURT:  You may.

15         MR. HOFFMAN:  Do you want to step over here?

16         MS. WOLFE:  Yes.

17         Thank you, Your Honor.

18         The position that we took in our sentencing

19   memorandum is that the -- all of the cases should not be

20   consolidated for purposes of Your Honor's applying the

21   guidelines.  The reason for that is, there are three separate

22   plea agreements in this case.  The first plea agreement

23   covered the first three docket numbers and the intention was

24   for those cases to be sentenced -- for sentencing on those

25   cases to be consolidated.

1          The subsequent plea agreements gave Mr. Berkun

2     criminal history points for the first cases and it

3     was -- clearly, it wasn't the intention of those -- under

4     those plea agreements for all of the cases to be smushed

5     together and the most onerous guidelines would be applied.

6          THE COURT:  The cases were consolidated at your

7     request.

8          MS. WOLFE:  They were, Your Honor.

9          Perhaps it was a stupid thing for us to do.  The

10    goal was to be able to have one proceeding and one judge be

11    able to look at all of the conduct and hear about Mr. Berkun

12    and who he is and what he's done over the past ten years

13    rather than have to do it three different times in front of

14    three different judges.

15         What we have suggested, which is -- would obviate an

16    ex post facto problem and would result in a fair calculation

17    is to take -- do a calculation of the guidelines for the first

18    three cases, which is, according to the Probation Department,

19    97, I think, to 100 and -- I put it in the papers -- 97 to 124

20    months.  Just give me a second.  Ninety-seven to 121 months

21    and that calculation incorporates an obstruction of justice,

22    two levels for obstruction of justice, which applied to those

23    cases.

24         If you take that guideline range and then you take

25    the guideline ranges for the other two cases that were several

1   years -- almost ten years later, and those guideline ranges in

2   criminal history Category 2 are zero to six months and 27 to

3   33 months, you would come up with a total range where you

4   stacked the three cases, giving him a bump up for criminal

5   history of 124 to 160 months.

6         We submit that adopting that guideline range would

7   obviate any ex post facto problem and that it is a fair and

8   correct range in this case, which takes into consideration all

9   of his conduct.

10         MS. NGUYEN:  Your Honor, the government has no

11   objection to defense counsel's essentially withdrawing the

12   motion to consolidate the cases for sentencing and then having

13   Your Honor hear the first three cases, impose a sentence, and

14   then next impose a sentence for the 2010 attempted securities

15   fraud case and then impose a sentence on the tax -- the 2011

16   tax information.

17         THE COURT:  There was a 2010 indictment and a 2011

18   indictment.

19         MS. NGUYEN:  Right.

20         There is a 2010 attempted securities fraud case and

21   then a 2011 tax fraud case.

22         THE COURT:  Yes.

23         Which guideline would be applied?  Would we apply

24   the guideline in effect, the manual in effect at the time this

25   sentence is being imposed?

1          MS. NGUYEN:  Yes, Your Honor.  I have spoken with

2     Ms. Betts about this yesterday and that was the position that

3     Probation took.

4          PROBATION OFFICER:  Yes.

5          MS. WOLFE:  Yes.  For the latter two cases, it --

6          THE COURT:  I am talking about the first.

7          MS. WOLFE:  The first?  Sorry.

8          THE COURT:  The latter two cases, there is no

9     question about what guideline manual ought to be consulted.

10          MS. WOLFE:  Yes.

11          THE COURT:  With respect to the first three

12     sentences is being imposed now, if the guideline manual to be

13     observed or the advice of the manual were to be observed, it

14     would be the manual in effect at the time that sentence is

15     being imposed which should be applied.

16          MS. WOLFE:  Our -- our position is that that would

17     be an ex post facto application of the guidelines.  That

18     the -- that all of the conduct -- in fact, all -- all of the

19     conduct covered by those indictment numbers occurred before

20     2000.  So that there is no -- several of the guidelines

21     adjustments have been substantially increased in the years

22     subsequent to the conduct.  Applying those increases would

23     violate the ex post facto clause.

24          THE COURT:  Well, I don't know if that clause is

25     even applicable here.

1          MS. NGUYEN:  The government would take the position

2     that there wouldn't be an ex post facto issue because the

3     Sentencing Guidelines are discretionary, advisory, under

4     Booker.

5          MS. WOLFE:  Your Honor --

6          THE COURT:  I guess semantically the phrase is

7     ex post facto law.  There is no law with respect to the

8     application of sentence now.  The guidelines were declared

9     unconstitutional some years ago and we had the remarkable

10    oxymoronic situation where an unconstitutional law is

11    nevertheless required to be consulted by a sentencing judge,

12    and if the sentencing court doesn't abide by the advisory

13    guidelines very closely, then the sentence may be regarded as

14    unreasonable, which is absurd for a variety of reasons.

15         I am curious and interested in the last Second

16    Circuit pronouncement with respect to the ex post facto law,

17    namely, the anticipated risk perceived by whom.  My

18    understanding is that a defendant has no vested interest in

19    the sentence to be imposed.  The statute with respect to, I

20    think it's the 512 indictment, provides for imprisonment up to

21    25 years.  Securities offenses provide for imprisonment up to

22    20 years.  There is no vested interest that a defendant ever

23    had in where within a statutory sentencing range of zero to 20

24    or zero to five or zero to ten, he had some constitutional

25    right to be sentenced.

1          I don't know whose risk is being anticipated in

2    Ortiz.  It seems to run a little bit contrary to what Judge

3    Newman had to decide and write years ago in United States

4    versus Jones, that the guidelines didn't deprive federal

5    judges of their sentencing determinations which they've had

6    from time immemorial.

7          In any event, since there is no disagreement between

8    the government and the defendant, let's get it very clearly

9    stated on the record and let's first, before we even do that,

10   make sure, since the Second Circuit requires the first thing

11   the Court to do is to satisfy the procedural requirement of

12   determining what the guidelines are, let me satisfy that

13   procedural requirement and determine precisely what the

14   applicable guidelines are.

15         If we look at the last submission by the Probation

16   Department, they have a total offense level of 39 and an

17   advisory guideline range of 262 to 327.

18         As I understand it, the parties have agreed that

19   that is not the guideline that should be applied or

20   considered.  The parties are taking the position, as I

21   understand it, that there should be a guideline determination

22   of the first three indictments, whatever the guideline

23   determination with respect to those first three cases would

24   be, and then a separate guideline determination with respect

25   to the 2010 and 2011 guideline.

10

1          MS. NGUYEN:  That is correct, Your Honor.

2          THE COURT:  So what are they?  How are they being

3    arrived at, so that the procedural step that the Court of

4    Appeals requires us to satisfy are satisfied?  I don't know

5    whether the Bureau of Prisons is vitally concerned in how that

6    calculation is arrived at.

7          MS. NGUYEN:  Your Honor, the government relies on

8    the Probation Department's calculation and I believe that on

9    page six of the addendum to the second revised presentence

10   report, on page six the Probation Department calculates that

11   the range for the first three cases would be 97 to 121 months

12   based offense level of 30 and a criminal history category of

13   one.

14         MS. WOLFE:  We agree with that, Your Honor.  The way

15   we confirmed that is we looked at the Probation report that

16   was prepared in 2005, using the 2000 guidelines.

17         THE COURT:  With --

18         MS. WOLFE:  There were certain changes made based on

19   our objections.  The 2005 report had included an enhancement

20   for role, which the government and Probation agreed is not

21   applicable.  So that was eliminated from the 2005 calculation.

22         Then an additional two levels was added for

23   obstruction of justice based on statements he made to the

24   Probation Department in the year -- between 2005 and 2008.

25         THE COURT:  With respect to indictment numbers

1    OO-1248 and OO-930 and O1-1457, the parties are agreed that

2    the total offense level which the guidelines would advise

3    would be a level 30 and a criminal history category of one, is

4    it?

5                    MS. NGUYEN:  That is correct, Your Honor.

6                    PROBATION OFFICER:  Yes.

7                    THE COURT:  That would be 97 to 100-what?

8                    MS. NGUYEN:  One hundred twenty-one months.

9                    THE COURT:  That's agreed?

10                   MS. WOLFE:  Yes.

11                   THE COURT:  With respect to indictment number 10-512

12   and 11-214, what agreement did the parties come to?

13                   MS. WOLFE:  Probation and the government and the

14   plea agreement all set forth the anticipated -- the plea

15   agreement sets forth the anticipated guideline range and

16   Probation concurred with that when it did its workup.  The

17   only -- so the 2010 attempted securities fraud is a level

18   five, criminal history Category 2, and zero to six months.

19                   MS. NGUYEN:  Although, Your Honor, in calculating

20   the guidelines for the second two offenses, it may make more

21   sense to sentence Mr. Berkun on the first three cases,

22   OO CR 1248, 00-930, and 01-1457 since -- because he's not been

23   sentenced on those cases yet, we would not know exactly what

24   criminal history category he would fall into for the latter

25   two cases in order to --

1       THE COURT:  With respect to that, just let me also

2   observe that I entirely disagree with the construction which

3   both the government and the defense puts on 4A1.2 with respect

4   to criminal history category.  Your reading of the advisory

5   guideline does not accord with either common sense or a

6   reading of the guideline.  To the extent that you rely upon

7   what the guideline definition of prior sentence is, what you

8   omit to take notice of, in looking at 4A1.2, 4A1.2(a)(1), the

9   reading that both the government and the defense has is that

10  4A1.2(4) is not applicable because prior sentence winds up

11  with reading for conduct not part of the instant offense.

12          In the first place, if you look at 4A1.2(a), it says

13  the term prior sentence means any sentence previously imposed.

14  No sentence has been previously imposed.  Therefore,

15  4A1.2(a)(1) clearly is not applicable.  4A1.2(4) is entirely

16  applicable just as a matter of common sense.  Where a

17  defendant has been convicted of an offense -- and he has been

18  convicted of an offense.  He's pleaded guilty.  He hasn't been

19  sentenced yet but he's pleaded guilty to all five

20  indictments -- but not yet sentenced, such conviction shall be

21  counted as if it constituted a prior sentence under 4A1.1(c)

22  of a sentence resulting from that conviction that would

23  otherwise be countable.  Otherwise, you'd have what you have

24  here.  You'd have five convictions and you have a criminal

25  history category of one.

1          MS. NGUYEN:  Your Honor --

2          THE COURT:  Which obviously flies in the face of

3   common sense.

4          In any event, it is academic given the view that you

5   are all taking; and in view of the view that you are all

6   taking as to what the agreed guideline is and what the agreed

7   criminal history is, that's almost the equivalent of an

8   11(e)(1)(C) sentence, an agreed upon sentence.  So all of this

9   construction with respect to 4A1.2(a) and so on is really

10  academic.

11         Okay?

12         MS. NGUYEN:  Yes, Your Honor.

13         THE COURT:  Which is what it all amounts to.  You

14  are agreeing upon what the guideline sentence is.  So it is in

15  effect an agreed -- not an agreed sentence but an agreed

16  guideline application.  It is a analogous to an 11(e)(1)(C)

17  sentence.

18         Let me have the next two.  So we will sentence

19  Mr. Berkun on the first three indictments to which he's

20  pleaded guilty and then we will proceed to the other two.  So

21  I need to have Mr. Berkun allocute, to tell me what he would

22  like to say in mitigation of sentence.  Let us assume that

23  sentence has been imposed with respect to the first three and

24  the criminal history category would be what, on the next two?

25         MS. NGUYEN:  Your Honor, for 10 CR 512, which is the

1  attempted securities fraud, the Probation Department and the

2  government agrees, has their estimate on -- also in the

3  addendum to the second revised presentence report on page

4  three, that the base offense level for that would be seven,

5  with a two-point reduction for acceptance of responsibility,

6  would be five.  And then the criminal history category,

7  assuming that Your Honor sentences him on the first three

8  cases to a sentence that would give him a criminal history

9  category of two -- of two or three points, would land in

10  criminal history Category 2 and would call for a sentence from

11  zero to six months.

12          THE COURT:  On the last two indictments?

13          MS. NGUYEN:  On the -- on 10 CR 512 and then on the

14  tax --

15          THE COURT:  Yes.

16          MS. NGUYEN:  -- count, which is set forth on page

17  four of the second amended -- second addendum would be

18  adjusted offense level of 20, minus three points for timely

19  acceptance of responsibility, also assuming that the defendant

20  has a criminal history category of two, would call for a

21  sentencing range of 27 to 33 months.

22          THE COURT:  Ms. Wolfe?

23          MS. WOLFE:  We agree with that.

24          THE COURT:  What's the total offense level on the

25  last two?

1            MS. NGUYEN:  The last --

2            MS. WOLFE:  The last one is 27 to 33 months.

3            THE COURT:  Offense level being what, criminal

4    history category being what?

5            MS. WOLFE:  Seventeen.

6            THE COURT:  Pardon?

7            MS. WOLFE:  Seventeen.

8            THE COURT:  Seventeen, and two.

9            MS. WOLFE:  Seventeen, criminal history Category 2,

10   yes.

11           THE COURT:  Okay.  So it is 97 to 121 and 27 to 33

12   to be imposed, theoretically, consecutively.  Yes?

13           MS. NGUYEN:  That is correct, Your Honor.

14           MS. WOLFE:  Yes.

15           THE COURT:  Okay.  I am going to ask the Probation

16   Department to prepare a revised, an updated amended

17   presentence report.

18           PROBATION OFFICER:  Okay, Your Honor.

19           THE COURT:  Given these calculations.

20           PROBATION OFFICER:  Reflecting these calculations.

21           THE COURT:  So we are agreed on what the advisory

22   guidelines should be.

23           With respect to the rest of the presentence report,

24   are there any objections with respect to those?

25           MS. WOLFE:  The remaining objections that we have

1   are on the last page of our -- on page 14 of our sentencing

2   memo, and we -- we ask the Court to redact or to omit certain

3   paragraphs which refer to violent organized crime related

4   activity that Mr. Berkun was -- was not involved in.  Those

5   were on pages 19 and 31.

6           The reason we ask that is because they -- in our

7   experience, these types of allegations, which don't involve

8   Mr. Berkun --

9           THE COURT:  They do involve Mr. Berkun.  Let's get

10  that out of the way.  It's very clear, that he knew he was

11  involved with organized crime figures.  There is no question

12  about that.  Whether or not it ought to be redacted is

13  something else, as a matter of consideration for Mr. Berkun,

14  to put it charitably.  But it is not correct to tell me that

15  Mr. Berkun was not involved with organized crime.  He was.

16          I have been involved with this and related cases now

17  for some years.  What brought these cases to light essentially

18  was the invasion of organized crime into Wall Street and that

19  goes back to the Cappa case and to Arbel and to all the

20  others.  Organized crime was in it up to its ears and

21  Mr. Berkun knew it.  And if you read the last submission which

22  I gave you this morning, he met with Politto.  He was involved

23  with organized crime.

24          What else?

25          MS. WOLFE:  I hear what Your Honor is saying and the

1   fact that he -- we don't dispute that he knew.  In fact, part

2   of his conversation with the Probation Department.  But the

3   Probation report does not include everything, all of the facts

4   and circumstances of this case.  In fact, the 2005 Probation

5   report had various factual paragraphs that weren't in the 2011

6   guidelines.

7         The point being, that it's -- it's a matter of

8   discretion on the part of the Probation office what -- how

9   many factual details to include and I ask the Court --

10        THE COURT:  Before you get to that, Ms. Wolfe,

11   again, if you look at Section 3661, I think -- as I get older

12   my accuracy with respect to numbers may vary a little bit -- I

13   think it's 3661 or thereabouts, which says there is no

14   information which should not be available to the government

15   with respect to determining what a sentence is.  The

16   guidelines or the advisory guidelines say that too.  No

17   information should be unavailable.

18        Is it 3661?

19        MS. NGUYEN:  It is, Your Honor.

20        THE COURT:  What does it say?

21        MS. NGUYEN:  Use of Information For Sentencing.

22        No limitation shall be placed on the information

23   concerning the background, character and conduct of a person

24   committed of an offense which a court of the United States may

25   receive and consider for the purpose of imposing an

1  appropriate sentence.

2          THE COURT:  Okay?

3          MS. WOLFE:  We agree, that it -- it's appropriate

4  for -- to be in the PSR for Your Honor's consideration.  We

5  ask you in your discretion to exclude it as this PSR follows

6  him for whatever period of time it will.

7          THE COURT:  Does the government want to be heard on

8  that?  Does the government want to leave it to me?

9          MS. NGUYEN:  Your Honor, we leave it to the Court's

10  discretion.

11          THE COURT:  Why don't you remove it?

12          Let me have the specific -- what are the lines?

13          MS. WOLFE:  Paragraph 57.  I just want to make sure

14  that it is the same in the most recent PSI.

15          THE COURT:  October 7, 2011?  Is that the SR you are

16  looking at?

17          MS. WOLFE:  Yes.  Actually, it will be the same.

18  Because the -- the changes I believe were made through an

19  addendum.

20          So there is paragraph 57 and subparts E through F,

21  which detail the -- the violent activities.

22          THE COURT:  For the benefit of the Probation

23  Department, we are on paragraph 57 of the presentence report.

24          MR. HOFFMAN:  Your Honor, while -- while we are

25  doing that, Mr. Berkun has an inguinal hernia that is acting

19

1   up.  He asks if he can sit down.

2             THE COURT:  He can sit down.

3             MR. HOFFMAN:  Thank you.

4             MS. WOLFE:  Yes, it is paragraph 57.

5             THE COURT:  Subdivision -- starting with

6   paragraph -- subparagraph E.  Not paragraph.

7             MS. WOLFE:  E and F.

8             THE COURT:  E and F.  Okay?

9             MS. WOLFE:  And then paragraph 31 -- page 31,

10  paragraph 102.  No.  That's not correct.

11            THE COURT:  No.  They are talking about -- those are

12  other defendants.

13            MS. WOLFE:  It actually is paragraph 98.  No.

14            MR. HOFFMAN:  No.

15            MS. WOLFE:  No, it is not paragraph 98, Your Honor.

16  I am -- I am trying to correlate it with changes that have

17  been made.

18            (Pause.)

19            THE COURT:  There was an addendum dated January 5th

20  which contained references to all of that.  Let's not take too

21  much time with that now, Ms. Wolfe.  You can find it later.

22            MS. WOLFE:  Okay.  I will, Your Honor.

23            THE COURT:  Let me know what it is you are

24  requesting.

25            MS. WOLFE:  I will.

1          THE COURT:  Is there anything else, Ms. Wolfe?

2          MS. WOLFE:  No, Your Honor.  Those are our

3    outstanding objections.

4          Thank you.

5          THE COURT:  Do you want to be heard beyond that?

6          MR. HOFFMAN:  May I, Your Honor?

7          THE COURT:  Does Mr. Hoffman want to be heard?

8          MR. HOFFMAN:  Thank you.

9          THE COURT:  Yes.

10          MR. HOFFMAN:  Thank you, Your Honor.

11          If I may, and I will try not to be too wordy.

12          In this instance, I must tell the Court that I've

13    known Alan prior to my representation of him in these matters.

14    Our office represented him for some years before.  I will call

15    him Mr. Berkun.

16          Mr. Berkun was a securities -- a young securities

17    lawyer then and ultimately decided, which typically is a

18    mistake for lawyers, I found, that since his clients were

19    doing so much better than he and since he was so much smarter

20    than they, it would not be bad idea to get into that business

21    so he could do as well as they were doing.

22          When he did that, he wound up finding out that there

23    were reasons that they were doing so much better than he.  He

24    fell prey to falling into doing those things, knowing they

25    were wrong and knowing they were violations of the securities

1   law, and basically in a nutshell it was pump and dump kind of

2   stuff that was going on, I guess still goes on, but was

3   particularly going on pretty raucously in those days.

4          The first thing he got involved with was this

5   US Bridge entity which was a company that wanted to increase

6   its -- the value of its shares so it could make money.  He got

7   involved with those people, one of whom Your Honor just

8   mentioned, and he found shortly after doing so that he was way

9   in out of his depth.  I think you may have read it in the

10  presentence report.

11         He wound up after a meeting in a diner and being

12  told what money he has to supply them, whether or not his

13  activities are successful, put in the back of a truck with a

14  foot on his neck and a gun that was put to his head and

15  clicked and was told oops, it misfired.  And that was his real

16  introduction at that point in time as to what he was truly

17  involved in.

18         He ultimately settled the US Bridge matter with the

19  SEC in a civil suit.  That's when we first met him, and, in

20  fact, paid all of the restitution that was required by the SEC

21  for the victims.  So he obviously, from a financial

22  standpoint, did not come out very well either personally in

23  terms of having to pay all that back, which he did, as well as

24  what he had to pay the organized crime guys that he was

25  involved with.

1        At that point in time, he decided he wanted to get

2   out of the business and he sold it to a fellow named Hunter

3   Adams and his crew, bad guys; and he was asked to stay on,

4   because they didn't know how to deal with the regulators, to

5   stay on for a while when the transition was made.

6        He did that and they asked him again at a point in

7   time to be a front for some people so that he could -- so that

8   they could again play games with stock.  He did that.  He

9   wasn't involved in all their other machinations but in that

10  one situation he did it.  He was the front.  He was given ten

11  percent.  I think it was about a $5 million raise, and he got

12  ten percent of it for his fronting for these other true owners

13  of the stock.

14       During that time, he was in his office and he got a

15  call from some folks that he dealt with saying please come

16  over to our office.  We need your help on something.  He had

17  his little four or five-year old son with him.  I forget what

18  holiday it was.  It was Erev Yom Kippur and he ran over there,

19  because he had to leave early that evening, and what he was

20  confronted with was his friends and a group of other people he

21  didn't know and they said these guys have $50,000.  They want

22  to get it into the bank.  Can you help them?  It turned out

23  that their bank was his bank.  So he said yeah.

24       And during that conversation one of them said, you

25  know, this is narcotics money.  And Alan, being a smart-aleck

1    at that time, said I don't care what it is.  You want me to

2    move money from my account to your account, I'll do that.  The

3    reward was $5,000 which he split with the two other people and

4    then he left and went home.

5            That's the money laundering count.

6            After he was charged with those crimes that I have

7    just mentioned, I represented him and he in rather short order

8    met with the US Government.  Most of the Assistants are no

9    longer around, one of whom I just saw and hadn't seen in many

10   years, Nikki Kowalski, who was a part of that, of representing

11   the government at some point in time in those matters.

12           He cooperated fully.  He not only cooperated in

13   terms of normal cooperation, telling them everything he knew,

14   agreeing to cooperate, being debriefed innumerable times, some

15   with me and most without, but there were other instances where

16   the government came to him on situations that they heard

17   about, such as somebody who was involved with phony IDs or

18   Social Securities, asked him to make some calls.  He did that.

19   What he was asked to do, he did.

20           And, in addition to which, he gave

21   them --them meaning the government -- everything he had.  He

22   gave them stamp collections, which they auctioned off and got

23   money from.  He gave them whatever cash he had.  He gave them

24   all the stock he had in a company called MedGen, which they

25   never did anything with.  They just let it lay fallow.  Today

1   that stock is worth probably $30.00.  At that time it was

2   thousands and thousands of shares that were selling somewhere

3   around a dollar-and-a-half or $2.  I am not faulting the

4   government.  I'm just telling you the facts.  The facts are

5   that nothing was done with those stocks.

6           Even without them having sold those stocks as best

7   they could, he still wound up giving the government a few

8   million dollars.  And as the presentence report indicates, out

9   of all of the defendants in all of the cases, the total amount

10  of money that Alan gave is approximately two-thirds of the

11  claims that were made by people who were victimized.

12          The -- I don't know from the presentence report

13  whether anybody else contributed, whether the other third is

14  just -- was never paid or any contributions were made toward

15  it.  So I can't comment on that but I can comment on what they

16  said, which is true, in terms of what he turned over.

17          He tried to remake a life in Florida.  His wife in

18  New York, understandably based on all that had happened, left

19  him.  He had two little kids here in New York, and to this day

20  his ex-wife will say and has said that he paid everything he

21  was to pay in support of those kids.

22          Fortunately, he also was able to put money into an

23  account for the children for their college education, one of

24  whom is now in her second year of college, the other who is

25  about to go to college.  Those obligations are taken care of

1   and he's without any further financial obligations to them.

2   It doesn't mean he won't do what he can because he always has.

3   I want you to know that's the way he handled that situation.

4          He met a girl in Florida, Kimberly Thomas.  They

5   fell in love and they wound up having three children together.

6   There was a letter forwarded to Your Honor, hopefully you got

7   it yesterday, from Kimberly, who I spoke to last night and I

8   will get to that in a second.

9          He supported her and those three kids.  He worked

10  for a company called MedGen, the very company whose stock I

11  alluded to earlier, was turned over to the government for

12  disposition.

13         During all of those years he cooperated, as I said,

14  with the government on an ongoing basis when they needed him.

15  Obviously, they didn't need him every day.  Even to the point

16  where Mr. Arbel, who the Court has just mentioned, they asked

17  for assistance from Alan on what he knew about Arbel and he

18  told them everything and he would have been a potential

19  witness in that case.  I think Mr. Arbel and his

20  lawyers -- not I think -- I know had become aware of that and

21  Mr. Arbel pleaded shortly after his trial began, if I remember

22  correctly.

23         Had that been the situation, at some point in time

24  we would have been standing before Your Honor saying based on

25  all that and based on everything he had done, his cooperation,

1  his restitution, all the monies he paid, he deserved a

2  significant break vis-a-vis his cooperation.  And I believe

3  had we been standing before Your Honor under those

4  circumstances, there is no doubt in my mind that the

5  government would have given you a significant 5K1 letter

6  showing all the substantial assistance that he gave and we

7  would be able to tell you at that point in time all that he

8  had done in his daily life as a reformed person.

9         However, the pressures, the financial pressures of

10  continuing to support his two kids up north, and now having

11  this new family in the south, were tremendous, and he fell

12  behind on his taxes and fell behind on his taxes and fell

13  behind on his taxes for a number of years, in trying to make

14  all those ends meet.  I am not saying that's an excuse.  There

15  are lots of us who have all kinds of financial problems and

16  one way or another we make our tax burdens.  I am just giving

17  you the facts as to what actually happened.

18         A few years ago, I think it was in 2009, or ten, I

19  forget these days, he gets into a conversation with his -- his

20  and his family's stockbroker, a person that he knew for many,

21  many years, and who he had a long-standing fiduciary

22  relationship with.

23         During that time, the broker says to him, you know,

24  I'm in bad shape.  My company is not happy with me.  The

25  broker I believe was in his late seventies at the time.  I am

1   not producing any money.  What can we do?  Can you help me

2   out?

3            Alan said to him, there is a stock that I think I

4   can get.  If I get it, if you have some of your brokers buy

5   it, it will help move it up and we can make some money.  Wait

6   until you hear from me.

7            He didn't know he was talking to a broker who had

8   gotten in trouble and was working for the government.  Again,

9   this was an absolute violation of law.  He knew it.  He

10  thought about it.  His financial situation was as I have just

11  described.

12           It turned out he never got the stock and he never

13  could do the deal and never did do the deal.  However, he got

14  a further call from the broker saying, I -- in essence, I

15  didn't wait.  I had a few of my brokers, friends of mine, buy

16  the stock in the open market.  And Alan said, well, that was

17  silly because I don't have -- I don't own the stock.  So it is

18  of no value.  He said well, but I did it and it cost me $1,200

19  that I had to pay those guys.  Alan, feeling it was his fault

20  that this guy went out of pocket, sent him the $1,200 in cash.

21           And that's the attempted securities fraud that he's

22  pleaded to and stands convicted before Your Honor to be

23  sentenced on.

24           He has been in jail for 22 months.  He has been in a

25  holding facility for 22 months.  He hasn't seen fresh air for

1  22 months other than when he's come to court and is moved

2  quickly into a vehicle.

3          I am not going to go through all the horrors of the

4  MDC.  I'm sure Your Honor has heard it a million times.  But I

5  have seen a tremendous transformation in Alan.  The guy who I

6  knew as a bit of a smart-alecky guy, who was always looking

7  for an angle, isn't the guy that I have been visiting over the

8  last approximately two years at MDC.

9          While he's always been a good father, he's always

10 been a caring family person, he has seen what it is like to

11 have all that taken away; not taken away undeservedly but

12 taken away.  And that's something he just had never

13 experienced before.  I don't believe he will ever do anything

14 that could jeopardize the freedom to walk from one room to

15 another with a child or be with his family.

16         His wife -- I call her his wife.  The mother of his

17 children, Kimberly, called me last night about 10:30.  She was

18 very upset and what she was upset with was the lateness with

19 which she got the letter to Your Honor and the fact that she

20 forgot to put in there why she wasn't here.

21         She was crying and she basically said taking care of

22 three kids, ages eight down to I guess it's three or four,

23 alone, without the kind of finances that she can even bring

24 someone in to give her a break for a day or two, has been

25 tough.  It's why she didn't get the letter out.  That's why

1   she is not here.  But she asked me to tell you that and she

2   wanted you to know that.

3           Alan sent you a letter as part of the submission

4   which I must tell you I read and was -- I think it's pretty

5   accurate with the Alan that I have now come to know, who is

6   really a different guy.  He wants to speak to Your Honor.  He

7   should speak to Your Honor.  I said to him, and maybe I

8   shouldn't have, out of knowing a person for 12 or so years now

9   and knowing the nature of the person that I knew for the last

10  eight or nine years as opposed to the last two years, you

11  know, don't be a smart-aleck.  Talk from your heart and let

12  the judge see who you are today.

13          So I would ask the Court obviously, as defense

14  lawyers do, to give Alan the best sentence you think you can

15  in terms of what he truly did, including his falling off the

16  wagon, so to speak, and -- after seven or eight years of

17  being -- doing everything he had done.

18          In terms of what's necessary, what's a necessary

19  sentence, to deter him from ever doing anything wrong again,

20  to take into consideration the seriousness of what he has

21  done, I don't know how judges make that determination.  I

22  think it is mind-boggling.  But it is something you have to

23  do.

24          He did all the right things after he was caught.  He

25  fell off the wagon and did the things he did and they are

1    there and they are part of what you have to consider.

2          I think the heaviest sentence of all the people that

3    I saw, including -- I am referring to Hunter Adams, who ran

4    everything and had all kinds of schemes and was definitively

5    let's-go-out-and-rob-the-nation kind of person, was around

6    96 months, if I remember correctly.  I think it was something

7    just in the nine-year range.  I'm sorry.  One hundred eight, I

8    was reminded, months.

9          While Alan doesn't have 5K1 letter, the Court can

10   certainly consider all the assistance he did give to the

11   government and I put that before the Court.

12         I think Alan would like to address Your Honor.

13         THE COURT:  Does the government want to be heard?

14         MS. NGUYEN:  Yes, Your Honor, briefly.

15         I just want to clear up some things from a

16   chronology standpoint.

17         The government does not have -- does not disagree

18   that the defendant did make efforts to cooperate with the

19   government, was in a cooperation agreement, did get prepped

20   for trial and did provide information about other illegal

21   conduct that he knew about.

22         But it is not quite fair to view that conduct

23   between '98 and 2001 and then there being a large gap of time

24   and then Mr. Berkun fell off the wagon in 2008.

25         The tax charge -- and Mr. Mueller will go into this

1    in more detail -- those charges are from 2001 to 2005.

2    Mr. Berkun pled guilty to them in 2011 but he was engaged in

3    that conduct at the same time that he professed to be a

4    cooperator with the government.

5           Then the second thing I would like to point out is,

6    just from a factual standpoint, for the 2008 attempted

7    securities fraud, Mr. Hoffman sort of condensed the activities

8    to make it seem like there was one discussion and then the

9    next discussion Mr. Berkun had with the cooperator was that

10   the stock had already been purchased.  There was another

11   conversation in-between so that it wasn't that Mr. Berkun had

12   brought up this pump and dump scheme and then found out it had

13   been executed.  There had been another conversation where

14   Mr. Berkun indicated that he was interested in participating

15   in the pump and dump scheme.

16          I am going to turn over to Mr. Mueller to speak on

17   the tax case and I know that Ms. Nandan may have something on

18   the value of the MedGen stock.

19          MS. NANDAN:  If the Court is interested.

20          MS. NGUYEN:  Mr. Hoffman indicated that the

21   government -- that the MedGen stock had been worth something

22   in thousands of dollars.  The government didn't sell it.

23   That's not quite accurate.

24          MS. NANDAN:  In 2002, Your Honor, at the time of the

25   forfeiture order, MedGen stock according to SEC filings was

1    trading at about ten or eleven cents a share.  In 2003, the

2    stock price did jump to over a dollar.  However, that was

3    after an eighty-to-one reverse split.

4          I don't have all of the stock prices.  I will say,

5    that the stock has traded on both Over-the-Counter and the

6    Pink Sheets under different ticker symbols.  I do have notes

7    in my file going back at least three years, or close to three

8    years, of discussions with the Marshal Service about their

9    inability to sell the stock given its very low value.

10          So I don't know that that's material to the

11   discussion we are having here.  Mr. Berkun did in fact

12   surrender the shares of stock as he was required to do and as

13   he agreed to do.  The Marshal Service does have it.

14          Our proposed final order does ask the Court to

15   vacate the consent order insofar as it directed the forfeiture

16   of those shares simply because the Marshal Service cannot sell

17   them.  The current value as of a few weeks ago was under

18   $15.00.  So we are going to ask in the final order that the

19   Court vacate the forfeiture of those shares.

20          But that simply clears up a factual matter that,

21   again, I don't believe is necessarily relevant.

22          THE COURT:  There was about an $800,000 forfeiture?

23          MS. NANDAN:  He paid that money to the Clerk of

24   Court.  All of that was paid.  He surrendered the shares as

25   was required.

33

1          In hindsight, should we have sold in 2003 when they

2     were trading at more than $11?  You know, I would agree with

3     that.  But he surrendered the shares.  He paid the money as

4     required and he has consented to the forfeiture of stamps that

5     were seized in 2007 and the proceeds of those sales.  There

6     really is no dispute with respect to the forfeiture.

7          Ms. Nguyen had raised the -- and Mr. Hoffman had

8     raised the issue of the price of the stock, and given

9     that -- just that the Court understands, it -- it never

10    really -- it's always been a -- except for the -- historically

11    been a penny stock, Your Honor, unfortunately, that the

12    marshals are currently unable to sell.

13         THE COURT:  While we are on that, just let me make

14    certain we are on the same page as far as restitution is

15    concerned.  The presentence reports that I have, and there are

16    any number of them, and a number of addenda, on Count One of

17    the 00-1248 indictment, reports indicate restitution would be

18    ordered in the amount of $16,570,671.00.

19         MS. NANDAN:  I believe, Your Honor, there was a

20    three point --

21         THE COURT:  There were 39 victims that you have

22    information on.  There are a number of charts --

23         MS. NANDAN:  Correct, Your Honor.

24         THE COURT:  -- in the presentence report, which add

25    up to I think it was three million or 39,000,000.

34

1          MS. NANDAN:  Yes.  I believe it's at pages 25

2    through 27 of the second revised PSR.  The Probation

3    Department has listed the victims and their loss amounts.

4          THE COURT:  Yes.  390,590.

5          MS. NANDAN:  I'm sorry?  Oh, I am looking --

6          THE COURT:  It's $3,684,199.

7          MS. NANDAN:  That is correct, Your Honor.

8          THE COURT:  Paragraph 89.

9          MS. NANDAN:  Correct.

10         We would ask the Court to include the list of

11   victims and loss amounts in the judgment in compliance with

12   the MVRA as well as to facilitate the return of the monies to

13   them.

14         THE COURT:  $3,684,199.  Right?

15         MS. NANDAN:  Correct.

16         THE COURT:  Then there was restitution to be made to

17   the IRS?

18         MS. NANDAN:  That is correct, Your Honor.

19         THE COURT:  That was in the amount of $390,590?

20         MS. NGUYEN:  That is correct, Your Honor.

21         THE COURT:  The restitution figure should be

22   $3,684,199.03?  Those are to the victims listed on paragraph

23   89 of the PSR and $390,590 to the Internal Revenue Service.

24   Is that correct?

25         MS. NGUYEN:  That is correct, Your Honor.

1                THE COURT:  All right.

2                MR. HOFFMAN:  I think the government's figure as to

3       the restitution made to the victims was 2,384,000.  Is that

4       right?

5                THE COURT:  It's $3,684,199.

6                MR. HOFFMAN:  That's what's due.  That's what

7       they --

8                THE COURT:  That's the amount of restitution which

9       is due to the victims listed in paragraph 89.

10               MR. HOFFMAN:  Right.  But I believe that Mr. Berkun

11      paid 2.384 -- of two -- I'm sorry -- 2.362 million of that.

12      That's the only point I wanted to make.

13               THE COURT:  Is that correct?

14               MS. NANDAN:  I don't have the totals, Your Honor.  I

15      don't know whether and to what extent there has been interest

16      earned.  But significant payments have been made.

17               However, I would suggest that the proper course

18      under the law is to impose the full amount of restitution and

19      then he will be credited for that once those --

20               THE COURT:  The other alternative is, I think the

21      statute provides for a period of 90 days to make a final

22      determination with respect to restitution.  You can do it

23      either way.

24               MS. NANDAN:  I think -- the statute does provide

25      that, Your Honor.

1          I think the names and the loss amounts we have

2     agreed upon.  That's properly included in the judgment.  The

3     only question right now is exactly what that credit is, which

4     doesn't need to be reflected in the judgment.  That's really a

5     credit-debit thing that's done through the clerk's office and

6     our office.

7          THE COURT:  All right.  We will direct that

8     restitution be made in the amount of $3,684,199.03, minus

9     payments which have already been made, a determination of

10    which will be given to the Court in the final judgment with

11    respect to that.

12         MS. NANDAN:  Yes, Your Honor.

13         MR. MUELLER:  May I BE heard BRIEFLY on the tax

14    case, Your Honor?

15         THE COURT:  Yes.

16         MR. MUELLER:  Just two -- I won't belabor the

17    point, paragraphs 83 through 87 of the PSR have not been

18    objected to.  They lay out the conduct underlying the tax

19    conviction.

20         But I did want to just mention that, as Mr. Hoffman

21    characterized this period of time as simply falling behind on

22    your taxes, I think if you take a look at the table that's

23    laid out in paragraph 87, and we are dealing with between 2001

24    and 2005, in the ballpark of $1.3 million of unreported

25    income.  This seems to me more refusal to pay your taxes, not

1   simply falling behind on your taxes.  Not to mention the

2   proactive affirmative steps that were taken in terms of being

3   paid through nominee entities and offshore accounts.

4           I just wanted to get that on the record, Your Honor.

5           THE COURT:  I have that very, very clearly in front

6   of me.  Total unreported income of almost

7   one-and-a-half-million-dollars, $1,394,000.  I have it.

8           Mr. Berkun, what would you like to say to me this

9   morning?

10          THE DEFENDANT:  Good morning, Your Honor.

11          My saga starts as follows.  Approximately 17 years

12  ago, I committed securities fraud, I committed money

13  laundering and I pled guilty to those crimes.

14          Mr. Hoffman represented me and I determined that I

15  would cooperate with the government and at that time I did

16  cooperate with the government and I also made some substantial

17  restitution for those crimes.

18          I should be standing here, Your Honor, as

19  Mr. Hoffman said, with a glowing 5K report and I probably

20  should have put all this past me.  But, unfortunately, Your

21  Honor, my saga doesn't end there.  Because I continued to

22  commit crimes.  I violated the law.  I did not pay my taxes.

23          And then, if that wasn't bad enough, Your Honor, I

24  committed a second crime.  I succumbed to a government sting

25  operation whereby I got involved in another securities fraud,

1    or attempted securities fraud, for lack of the terminology.

2         Again, I take full responsibility for those crimes.

3    I realize what I did was wrong and I apologize to the Court,

4    to the government and of all the individuals that got hurt in

5    that report, I would personally apologize to all of them.

6         And because of that conduct, Your Honor, I paid a

7    hefty price.  I was imprisoned for the last 22 months.  And I

8    wake up every day, Your Honor, and what I did eats at me.  I

9    say to myself, how could I have violated the law a second

10   time.  And I say it loudly.  I say, how could I have violated

11   the law a second time.

12        I don't have an answer, but I do know one thing,

13   Your Honor.  That lost my freedom.  I lost an opportunity to

14   be with my family, to hold my children, to have privacy, and

15   as Jeff said eloquently, just to bask in the basic sunlight

16   and breathe fresh air.

17        I wrote to you in my letter, Your Honor, all the

18   hardships that I faced in that prison, in that hellhole over

19   there at MDC.  I'm sorry to use that language but that's what

20   it is.  I suffered there and I realized that only I put myself

21   in that situation, as terrible as that seems.

22        But I've had a lot of time to reflect on what I have

23   done and the bad activities and the crimes that I have

24   committed and I realize, Your Honor, that I'll never violate

25   the law again.  I'm not that person that went there.  I don't

1   even think, Your Honor, I would try to make a red light or

2   yellow light ever again because I have suffered there and

3   everything that I took for granted I lost.  So I've had a good

4   opportunity to reflect on those things.

5           The last time I was in court, Your Honor, I

6   understand that it was your 40th or 41st anniversary on the

7   bench, and I realized that after all those years, numerous

8   defendants stand here and apologize for their actions.  I

9   tried to focus on that because words -- it is just words but I

10  thought that in terms of trying to rehabilitate myself, trying

11  to fix myself as a man, trying to take that brain, whatever it

12  was in me beforehand, and clean myself up, I would have to do

13  something more than just have words.  Because at MDC, Your

14  Honor -- and the judiciary is well aware of this -- there is

15  no rehabilitation.

16          The 22 months that I have spent in the prison I have

17  become adept at crossword puzzles, 16 hours a day of

18  television.  They offer nothing for anybody to fix themselves.

19  So I turned to my faith because we believe that it is not only

20  words, it's action, it's deeds, and we are measured by that.

21          So I took the time, Your Honor, to first volunteer

22  and then become a GED teacher, five days a week.  And on top

23  of that, I was able to convince the warden to run a program at

24  night, three nights a week, and I am proud of that.  I've had

25  over 20 inmates pass the examination.  I have given hope to

40

1  people that have despair, that are institutionalized.

2          And I had one of the inmates write to you.  I have

3  with me, Your Honor, a second letter and the reason that I

4  didn't mail it to you was because this inmate got his results

5  on Friday before the New Years's Eve holiday.  The mail is

6  terrible at MDC.  You can put something in the mail, it shows

7  up two, three weeks later.  I didn't want to just take a

8  chance so I was wondering, Your Honor, if I could read it into

9  the record or just give it to you.

10          THE COURT:  If you like.

11          THE DEFENDANT:  I'd like to, Your Honor.

12          Dear Judge Glasser -- it is dated 12/30/11, Your

13  Honor, the date that the inmate received his results for

14  passing the GED.

15          My name is John Eberling.  I am an inmate at MDC

16  Brooklyn and confined to the same quarters as Mr. Alan Berkun.

17  I wanted Your Honor to know how Mr. Berkun personally helped

18  me obtain my GED degree and also what kind of man he is.

19          I attended Mr. Berkun's classes in the unit.  He

20  devoted three nights a week to teach me the subjects.  He

21  spent his weekend marking tests and pushing me to study so I

22  could pass the exam.  In fact, my first test results were lost

23  so I had to sit for the exam a second time.  Mr. Berkun

24  inspired me not to give up and because of his efforts I passed

25  the exam.

1          I'm also the head orderly on the unit.  We live in

2   hellish conditions at the facility.  Mr. Berkun pestered the

3   warden and his staff and had the unit environmentally cleaned.

4   All the bird feces and mold were finally removed because of

5   his letter writing and complaining.  I can truly say -- in

6   quotes -- we all breathe easier because of him.

7          Although I'm an inmate like Mr. Berkun, please

8   consider this when you sentence him.

9          Thank you.

10          I have that for you now.  I didn't put it in the

11   mail because of the chance that it wouldn't get here.

12          So on top of the hard work that I have put in at the

13   prison, Your Honor, I thought long and hard and I realized

14   that I guess the best way to summarize everything is to think

15   about what ex-president Clinton said.  He said that it's okay

16   to fall down but it's not okay to lay on the ground.

17          And I have tried to pick up the pieces of my life

18   and not lay on the ground, get out of that abyss and make

19   something of myself, as hard as it may seem under the

20   circumstances.  I believe I am ready to return to society, to

21   continue to redeem myself, but I understand that there are

22   some dire consequences to my entire crimes and my behavior.

23          Again, I apologize to the Court and to everybody

24   here.

25          I have two housekeeping matters, Your Honor, that I

1    would appreciate if you could attend to, since I have the

2    floor right now.

3            The first one is, Your Honor, assuming that you

4    determine that I need further incarceration, I would implore

5    the Court to send me to a facility in Miami.  There is a camp,

6    there is a low, my white collar crimes and the type of crimes,

7    without violence, would allow me to go to those facilities to

8    finish out my incarceration.

9            I haven't seen -- I haven't seen my children or my

10   wife in 22 months and I would think that if the Court could be

11   merciful and let me see them.  Excuse me, Your Honor.

12           The second thing is, my medical condition, Your

13   Honor.  I have an inguinal hernia.  Without going into all the

14   details, Your Honor, in May of the -- this year -- excuse

15   me -- of 2011, I visited the Medical.  When they diagnosed me,

16   my medical -- it was two-by-two centimeters.  They told me

17   that it's not life-threatening and it's reducible.  Without

18   gong into the mumbo jumbo of the medical field, Your Honor,

19   what reducible means is that, as it occurred here, numerous

20   times during the day I have to lay in bed and push my

21   intestine back through a hole in my body.  It makes it very

22   difficult.  I don't eat that well.  I don't sleep that well.

23   And they are indifferent.

24           Now, I know I have remedies and I followed those

25   remedies, Your Honor.  I filed every single administrative

43

1  appeal that's possible.  In fact, Your Honor -- and I am going

2  to introduce this to you -- I copied my entire file.  I filed

3  my final appeal to Washington on 10/23/11 and I have the

4  paperwork which I would like to submit to Your Honor.  They

5  have 60 days to respond.  Simple mathematics, that was the end

6  of December.

7          The Bureau is not interested to help me.  And if I

8  am to continue with incarceration, I implore the Court,

9  instead of me having to come back here with Mr. Hoffman and

10  tie up a busy calendar with 2241 motions, 1983 motions,

11  violating my civil rights and any level of decency, I ask you,

12  Your Honor, that could you please order them to take me to a

13  surgeon and let them fix it arthroscopically.  I am three,

14  four miles from some of the finest hospitals in New York, or

15  if I get sent to a facility, then let them do it there.

16  Because sometimes it is just difficult to continue on every

17  day in the type of pain that I am in.

18          I understand I have to be punished but it doesn't

19  have to be cruel and I ask you to please consider that as

20  well.

21          Finally, Your Honor, I want to thank Mr. Hoffman and

22  Susan.  He has been with me for 17 years on an endless saga

23  that I caused.  And I also would like to point out, Your

24  Honor, that in the gallery, my brother, who came today and I

25  just want to tell him I love him and that he's been very

44

1   supportive.

2           That's it, Your Honor.

3           Thank you.

4           THE COURT:  The Court is obliged to consider all of

5   the 3553(a) factors in determining what an appropriate

6   sentence should be.  The statute begins with advising the

7   Court that the sentence should be sufficient but not

8   excessive, and the Court should consider the nature and

9   circumstances of the offense, which have been referred to

10  obliquely here this morning.

11          Back in 2002, the defendant, nearly ten years ago,

12  pleaded guilty to a count in a 94-count indictment.  Counts

13  one and thirteen of indictment number 00-1248, which charged

14  him and 27 other defendants or 28 other defendants with

15  conspiring to commit securities fraud, mail fraud, wire fraud

16  and also in Count Thirteen with laundering the money which

17  that securities fraud yielded.  My recollection is that that

18  was somewhere in excess of $5 million that was laundered.

19          A couple of days thereafter, on the seventh of

20  February, Mr. Berkun pleaded guilty to Count One of a

21  two-count indictment, charging him and others with conspiracy

22  to commit securities fraud.  That was in connection with the

23  US Bridge stock, which resulted in a lost to investors of

24  $200,000.

25          I should have indicated that with respect to that 29

1  count or 94-count 29 defendant securities fraud, that crime

2  resulted in investor loss of approximately

3  sixteen-and-a-half-million-dollars.

4          Not long after that, Mr. Berkun pleads guilty to

5  Count One of a two-count indictment, charging him and others

6  with conspiracy to launder the proceeds of a drug transaction.

7          And then some years go by and in 2010 he pleads

8  guilty to a single count charging him with attempt to commit

9  securities fraud, about which we have just heard, and then

10 just in April of last year, pleaded guilty before Judge Ross,

11 I believe it was, to income tax fraud, unpaid taxes of earned

12 income, of almost a million-and-a-half-dollars.

13         The history and characteristics of the defendant in

14 broad outline, 53 years old, brought up in circumstances that

15 can be aptly categorized as middle income circumstances.  His

16 father owned a lacquer manufacturing business, which

17 Mr. Berkun ran for a while and sold it at a profit of about

18 $700,000, I believe.  He has a brother who is a pediatrician.

19 He married in 1990, separated 12 years later, subsequently

20 divorced, had two children with that union.  He has a daughter

21 who is 19 and a son who is now 16, I believe.

22         Then in 2002, he commenced a relationship with

23 another, with whom he had been living since then, and with

24 whom he has had three children, who are I believe

25 approximately seven, six and five.

1       He is in pretty good health.  He has some

2  cholesterol problems, takes Lipitor.

3       His brother wrote an eloquent letter suggesting that

4  Mr. Berkun may be suffering from a vitamin D deficiency, for

5  lack of sunlight.  He also has an inguinal hernia that we just

6  heard about.

7       He is a college graduate, graduate of Yeshiva

8  University, and also was a graduate of the Hofstra Law School.

9  He was admitted to the Bar of New York in 1983 and resigned in

10  2002.  I believe he's also admitted to the Bar of the State of

11  Florida, but that status is, I believe, just in limbo.

12       He has been steadily employed over the years, for

13  the most part in activity which was not lawful.

14       He also has been apparently a very, very successful

15  stamp collector.  Stamp collections have been sold at auctions

16  for well over a million dollars.

17       Those are the history and characteristics of the

18  defendant, the nature and circumstances of the offense, which

19  brings me to 3553(a)(2), the need for imposing a sentence

20  which the Court is advised to determine by considering a

21  number of factors.

22       The seriousness of the offense.  Serious offenses, I

23  would suspect if most persons were asked to state what they

24  regard as a serious offense, they would probably recite a list

25  of physical harm offenses, such as assault, battery, kidnap,

1    rape, robbery, burglary.

2              The harms that Mr. Berkun has committed over the

3    years, which are essentially white collar, to put it

4    euphemistically, referred to as white collar offenses,

5    property offenses, I received a sheaf of paper from a lawyer

6    representing some people in Germany.  Over four thousand names

7    were sent to the Court and the sheaf of papers are about two

8    inches thick, which claims that over four thousand people were

9    bilked of an enormous sum of money, 4,438 private investors

10   were bilked somewhere between 56 to $79 million.

11             MR. HOFFMAN:  Can I comment on that Your Honor?

12             THE COURT:  I am not finished.  I will give you an

13   opportunity.

14             MR. HOFFMAN:  I appreciate that.  Thank you.

15             THE COURT:  That was an event which allegedly

16   Mr. Berkun was involved with Mr. Arbel.

17             Putting those aside, the securities fraud in which

18   he was involved with that 94-count indictment and 28 other

19   people resulting in losses to investors of $16 million.  It is

20   not very difficult to imagine what $16 million of loss to

21   investors represent in terms of collateral harm.  These are

22   investors, hundreds of them, who were buying not blue chip

23   stock, buying penny stock, stock which was worth very, very

24   little.  By way of sweatshop operations that were being

25   conducted by those defendants, inducing hundreds of people to

1    part with $16 million, creating in them the illusion that they

2    are going to get rich.  They are investing in stock which is

3    going to increase dramatically in value, and did increase

4    incrementally by these pump and dump tactics which were

5    engaged in.

6              It is not difficult to imagine how much of that

7    $16 million may have represented savings that were put aside

8    for old age, savings that were put aside for the education of

9    a child, money that was needed for the support of an aged

10   parent.

11             I suppose some people might regard the harm which

12   was caused by that offense and those offenses as serious.  I

13   do.

14             The victim impact of those security frauds are

15   outlined in paragraph 89 of the presentence report and persons

16   who were attempted to be contacted and reveal or claim what

17   their losses were.  There were only 39 of them I think who

18   responded and those 39 yielded losses of 3,684,000.

19             Then in paragraph 90, you have this correspondence

20   from this lawyer in Montana who also represents these German

21   interests.

22             So there was significant victim impact.

23             Then the statute speaks of promoting respect for the

24   law.  The record which I have broadly outlined quite clearly

25   manifests a disrespect for the law.  I have had occasion to

1  say, unfortunately too frequently, that what is meant or what

2  I understand to be meant by 3553(a), telling the Court that

3  one of the objectives of sentencing is to promote respect for

4  the law, is to have the person standing before me understand

5  that that means respect the law or, to put it more bluntly,

6  the law means what it says, and you should understand that.

7  And you as a lawyer of all people should have understood, and

8  truly did, that the law means what it says. When the law says

9  don't commit securities fraud, which is another almost

10 euphemistic way of saying don't steal from unsophisticated

11 people, because that's what inducing them to part with money

12 amounts to, you were stealing, inducing people to buy stock

13 which was worthless and pocket millions of dollars doing that.

14         You knew it was wrong and you continued to do it

15 over the years and you continued to do it and even ten years

16 later, after you pleaded guilty to the securities fraud and

17 money laundering, you did it again, in 2010. You were doing

18 it over the years while you were earning substantial sums of

19 money, not paying taxes. You knew that was wrong and every

20 time you filled out a W-2 form or a 1040 form, you lied and

21 you were lying under oath because when you signed that return

22 you were certifying you were telling the truth. You were

23 telling the government you weren't earning anywhere near the

24 amount of money that you were earning and you weren't paying

25 taxes.

1          The unfortunate, almost tragic part of that, as you

2    have indicated, you are talented.  You had a law degree.  You

3    may not have become a multimillionaire practicing law but

4    whatever money you would have earned would have been earned

5    honestly.

6          Then 3553(a) tells the Court to do what is the

7    hardest thing for the Court to do, to determine what just

8    punishment is.

9          Regarding principles of sentencing, you shouldn't be

10   surprised about.  You have talked about rehabilitation.

11   Rehabilitation is not an objective of sentencing.  The statute

12   specifically says it.  If you look at the statute which

13   created the Sentencing Commission and you look at Section 994

14   subdivision K of Title 28 of the United States Code, it

15   specifically says, rehabilitation is not an appropriate

16   objective of sentencing.  If you look at 3582 of Title 18 of

17   the United States Code, it says the same thing.

18         Anybody with any experience, any knowledge of the

19   criminal justice system, knows that rehabilitation is not the

20   objective of sentencing.  Any judge who is sending somebody to

21   prison because it is good for them ought to be impeached for

22   it.  It isn't.

23         Incapacitation, that's not applicable to you, in the

24   sense that you are not dangerous, not dangerous in the sense

25   that you are a threat to inflict physical harm on others.  But

1   whether you will continue to inflict the financial harm on

2   others, as you have been doing, I am not willing to make a

3   prediction about one way or another.  Your record indicates

4   that despite the fact that you pleaded guilty to securities

5   fraud and money laundering back in 2002 didn't deter you from

6   doing it again back in 2010.

7           I would hope that when you are free again you will

8   listen to a little voice, which obviously you either don't

9   have inside you or you weren't listening to, little voice that

10  tells all of us, or most of us, not to do something we know to

11  be wrong.  Most of us listen to that little voice.  You knew

12  that what you were doing was wrong.  That little voice

13  hopefully was there telling you that but you were ignoring it.

14          So what is left in determining just sentence?

15  General deterrence is a legitimate objective, to discourage

16  others like you to commit the crimes such as the ones that you

17  were committing, making it clear that the law means what it

18  says and look at what happened to Alan Berkun who had been

19  committing those crimes.  You do it, you are going to suffer

20  the same fate.  That's a legitimate objective of sentencing.

21          Anything less than imprisonment in your case would

22  depreciate the seriousness and the enormity of the crimes that

23  you have committed.

24          What all that is about is that the Court should

25  impose a sentence that should convey that the crime for which

1   the sentence is imposed is not just a minor traffic offense.

2   It is a serious, serious crime.  The sentence should reflect

3   that.

4         The sentence should reflect that there is some

5   proportionality between the sentence that is being imposed on

6   you, who are privileged in many respects -- you are.  You had

7   a college education.  You had a law degree.  The sentence

8   that's imposed should convey to some extent that those who are

9   privileged will be punished too.

10        All that having been said, Mr. Berkun, the most

11  difficult thing for any judge to do, certainly for me, is to

12  look another human being in the eye and say you are going to

13  be deprived of your liberty for a time and you are going to be

14  deprived of your liberty because you have breached an implicit

15  contract which all of us have with our community, the contract

16  being that we are not going to commit crimes.  We are going to

17  try and live in a law-abiding way so that we can all live in a

18  civilized environment, in a civilized society.

19        When you have ignored that implicit agreement, you

20  have made a declaration that you don't want to live in

21  accordance with the laws of civilized society.  So being

22  sentenced in effect is telling you that having made that

23  choice you are going to live outside the boundaries of

24  civilized society.  That's the choice that you have made for

25  yourself.  That's essentially what sentence is all about:  You

1   have broken a very, very solemn contract which all of us have

2   to each other and with each other, and I have a responsibility

3   not only to you,  Mr. Berkun, but to the community that sent

4   me here, to make sure that it is understood that serious

5   crimes will be punished with a degree of seriousness.

6          The sentence I am going to impose upon you may be

7   questioned insofar as whether it is serious or not.  The law

8   requires us to sentence a young kid from the ghetto who has

9   not had a privileged upbringing and has been arrested with

10  five grams of crack to mandatory sentences which run up to

11  five or fifteen years, hasn't stolen millions of dollars.

12         Your guidelines begin, forgetting about the very

13  charitable agreement that the government has entered with the

14  defense as to segregating the sentence, your guidelines if

15  they were to be imposed in accordance with the advice that the

16  sentencing guideline provides would have been somewhere

17  between 290 some odd and 324 months.  That would probably be

18  regarded by most reasonable people as perhaps excessive, even

19  for the crimes that you have committed.

20         So with respect to indictments numbered OO CR 1248,

21  and OO CR 930 and 01 CR 1457, which it was agreed had a total

22  offense level of 30 and a criminal history category of, I

23  think it was two, guideline is at 97 to 121 months, I am

24  sentencing you to a term of 60 months on those three

25  indictments.

54

1          On 10 CR 512 and 11 CR 214, I am sentencing you to

2     another term of 12 months, to run consecutively to the

3     60 months already imposed.

4          I am adding on each of those counts a term of

5     supervised release of three years; supervised release does not

6     run consecutively.  They are concurrent.  Although it would be

7     consecutive in terms of the 12-month sentence.

8          There is a special assessment of $600.

9          I am not imposing a fine because the Probation

10    report indicates that the amount of restitution that will be

11    ordered would make a fine unnecessary, if not impossible and

12    unrealistic.  So restitution will be ordered in the amount of

13    $3,684,199.03 to be paid to the persons listed, I think it's

14    in paragraph 89.  Restitution is to be paid $25 quarterly

15    while you are incarcerated and thereafter ten percent of your

16    gross income you would be earning after you have been

17    released.  The money should be sent to the Clerk of the Court.

18         The $600 special assessment should be paid today.

19         There are a number of open counts and I think some

20    open indictments.

21         With respect to OO CR 930, the government will move

22    to dismiss Count Two, I take it.

23         MS. NGUYEN:  Yes, Your Honor.

24         THE COURT:  That motion will be granted.

25         With respect to indictment number OO CR 1248, the

1  defendant pleaded guilty to counts one and thirteen of the

2  first superseding indictment.  As I understand it, the

3  government will move to dismiss all the other counts in that

4  94-count indictment of which Mr. Berkun is named, which are

5  counts six, seven, fourteen, fifty-two to fifty-five, sixty to

6  sixty-one, sixty-two to eighty-three.  I think it would be

7  correct to say counts fifty-two to ninety-three are counts in

8  which Mr. Berkun has been named.  I believe the government is

9  going to move to dismiss those open counts and the first

10  indictment which is still outstanding.

11          MS. NGUYEN:  That is correct, Your Honor.

12          THE COURT:  This is a superseding indictment.  Is

13  that the government's motion?

14          MS. NGUYEN:  Yes, Your Honor, it is.

15          THE COURT:  And indictment 01 CR 1457, the defendant

16  pled guilt guilty to Count One and the government will move to

17  dismiss Count Two?

18          MS. NGUYEN:  Correct, Your Honor.

19          THE COURT:  Granted.

20          Indictment 10 CR 512, there are no open counts and

21  there are no open counts on the 214 indictment.  That's

22  11 CR 214.

23          MS. NGUYEN:  That is correct, Your Honor.

24          THE COURT:  I think I have indicated that there is a

25  $600 special assessment.  I am not imposing a fine.

1          I will recommend, in response to your request that I

2     order -- I cannot order the Bureau of Prisons with respect to

3     the assignment they may make to serve your sentence.  I can

4     recommend and I will recommend that the Bureau of Prisons

5     designate you to a camp facility in the Miami area, or as

6     close to it as geographically possible.

7          If the Bureau of Prisons follows its stated policy,

8     they should designate a defendant as close as possible to his

9     family in order to continue to maintain some semblance of

10    family unity.

11          I will also try to direct the Bureau of Prisons to

12    provide with you the necessary medical attention that you

13    need, and I will do that.

14          I don't think there is anything left.  Although I

15    think I interrupted you, Mr. Hoffman.  There is something you

16    wanted to say?  I think it was in connection your opinion

17    that --

18          MR. HOFFMAN:  Just two quick matters.  One is, I am

19    not sure if the bail was exonerated so I would ask the Court

20    to exonerate the bail.

21          THE COURT:  If it hasn't been, So Ordered.

22          MR. HOFFMAN:  Secondly, when Your Honor described

23    the --

24          THE COURT:  With respect to bail, I don't know how

25    much -- who posted the bail and what is it?  Does anybody know

57

1  offhand?

2          MR. HOFFMAN:  It was basically I think his and his

3  mother's homes.

4          THE DEFENDANT:  Both homes were posted.

5          THE COURT:  We will exonerate the bail.

6          MR. HOFFMAN:  Secondly, when Your Honor referred to

7  the fact of supervised release on the second sentence would

8  probably be consecutive since the sentence is consecutive,

9  Your Honor said the second sentence of 12 years.  I think you

10  meant one year.

11          THE COURT:  I said 12 months.

12          MR. HOFFMAN:  Twelve months.  I'm sorry.

13  Twelve months.

14          Thank you.

15          MR. MUELLER:   Your Honor --

16          THE COURT:  Total sentence is 72 months.

17          MR. MUELLER:  Your Honor, I had one point to

18  clarify.  Did the restitution figure that you gave of

19  $3,684,199.03, does that -- that does not include the

20  restitution to the IRS?

21          THE COURT:  I'm sorry.  It does not, no.

22          The IRS -- I'm sorry.  I neglected to add, I think

23  it was agreed, in the plea agreement, that he was going to

24  make restitution to the IRS in the amount of $390,590.

25          MR. MUELLER:   Thank you, Your Honor.

58

1    MS. NGUYEN:  Thank you, Your Honor.

2    MR. HOFFMAN:  That is correct.

3    MS. NANDAN:  Your Honor, I neglected to hand up the

4  final order of forfeiture when I was speaking earlier.  I will

5  do that.

6    THE COURT:  Has the defense seen it?

7    MS. NANDAN:  Yes, Your Honor.

8    MS. WOLFE:  Your Honor, I have had the time to go

9  through the paragraphs that I thought would be injurious to

10  Mr. Berkun and they are each of the paragraphs in 102 through

11  129, refers to either organized crime or extortion.

12    My suggestion is, all of those -- shall I continue?

13  All of those paragraphs pertain to defendants in indictments

14  in which Mr. Berkun was not charged.

15    THE COURT:  I will remind you that I think those

16  indictments charged Mr. Berkun with conspiracy.

17    MS. WOLFE:  His indictment charges him with a

18  conspiracy, correct.

19    THE COURT:  In all of those indictments, they were

20  all conspiracy and I don't think I have to review with you the

21  law of conspiracy, Ms. Wolfe.

22    MS. WOLFE:  I am not making the argument you might

23  think I am making.  I am making an argument why it wouldn't be

24  in any way misleading to anyone to take out those paragraphs

25  because they were not codefendants in the indictments in which

1  he was charged and the odd thing is that there is no

2  description of the codefendants in the 1248 case in which he

3  was charged.  That's what's odd.  Those paragraphs in the

4  previous PSI did not have references to extortions and

5  organized crime.

6          So I can do one of two things.  I can ask Your Honor

7  to take out paragraphs 102 through 129 or just give you the

8  lines that I would ask -- that I would ask be redacted.

9          THE COURT:  There is nothing in 129 that refers to

10  organized crime aside from the mention of Persico.  People who

11  might be familiar with who Persico is would get the idea that

12  there is some organized crime involved.  Otherwise, there is

13  no mention of organized crime in paragraph 129 that I am

14  looking at, unless I am missing it.

15          MS. WOLFE:  No.  Those -- the series of paragraphs

16  all have to do with the defendants who were charged in other

17  indictments, not 930, not 1248.  That's why I lumped them

18  together.  There are one, two, three, four, five, six, seven,

19  eight of those paragraphs specifically refer to organized

20  crime or extortion and I can send Your Honor a letter

21  identifying the language.

22          THE COURT:  With respect to whatever reference there

23  may be, Ms. Wolfe, given the leniency of the sentence that I

24  have imposed, or at least the sentence which may be perceived

25  to be lenient, it is fairly obvious that those references did

1  not have a bearing on the sentence which I have imposed on

2  Mr. Berkun.  Right?

3          MS. WOLFE:  Absolutely, Your Honor.

4          Our concern always was what the Bureau of Prisons

5  would do.

6          THE COURT:  I understand your concern.  I think we

7  have eliminated the references to organized crime that are

8  specific.  The other references refer to persons who are other

9  defendants and have no relationship to Mr. Berkun.

10         MS. WOLFE:  Okay.

11         THE COURT:  They are obvious.

12         I signed the order.

13         Did you want to say something?

14         MS. NGUYEN:  Your Honor, I would just ask that you

15  advise the defendant of his right to appeal.

16         THE COURT:  Yes.  Thank you.  I had that before me.

17         Mr. Berkun, you have a right to appeal your

18  sentence.

19         I don't know whether in the plea agreement he waived

20  his right to appeal if the sentences were not in excess of a

21  given amount.  I don't know.

22         But, in any event, even if those plea agreements did

23  provide it, and even if you waived your right to appeal, I'm

24  sure if you did you did it knowingly and voluntarily, given

25  your legal background, I am advising you, Mr. Berkun, that you

1    have a right to appeal this sentence and if you can't afford

2    to pay for the costs of an appeal you can make an application

3    to have the costs waived.

4            Anything else?

5            Thank you for reminding me of that.  I hadn't paid

6    attention to it.

7            Anything else?

8            MS. NGUYEN:  Nothing further from the government,

9    Your Honor.

10           THE COURT:  Anybody else?

11           MR. HOFFMAN:  Nothing.

12           Thank you.

13           MS. WOLFE:  Thank you, Your Honor.

14           MS. NGUYEN:  Thank you, Your Honor.

15           THE DEFENDANT:  Thank you, Your Honor.

16           (Matter concludes.)

17

18

19

20

21

22

23

24

25